Death Opinion



 












IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,703






JAIME PIERO COLE, Appellant


 

v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 1250754


IN THE 230TH JUDICIAL DISTRICT COURT

HARRIS COUNTY






 Johnson, J., delivered the opinion of the unanimous Court.


O P I N I O N



 In October 2011, a jury convicted appellant of capital murder for the shooting deaths of his
wife and step-daughter during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7). 
Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 §
2(g). (1) Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises seventeen points
of error. After reviewing appellant's points of error, we find them to be without merit. 
Consequently, we affirm the trial court's judgment and sentence of death.

Sufficiency of the Evidence--Future Dangerousness

 In point of error ten, appellant challenges the sufficiency of the evidence to support the jury's
affirmative answer to the future-dangerousness special issue. Art. 37.071, § 2(b)(1). We shall
address this issue first, followed by the remaining points of error in the order presented in the briefs. 

 The future-dangerousness special issue requires the jury to determine "whether there is a
probability that the defendant would commit criminal acts of violence that would constitute a
continuing threat to society." Art. 37.071, § 2(b)(1). When reviewing the legal sufficiency of the
evidence supporting an affirmative answer to the future-dangerousness special issue, we review the
evidence in the light most favorable to the verdict. Williams v. State, 273 S.W.3d 200, 213 (Tex.
Crim. App. 2008); see Jackson v. Virginia, 443 U.S. 307, 319 (1979). Assessing the evidence and
all reasonable inferences therefrom in this light, we determine whether any rational trier of fact could
have believed beyond a reasonable doubt that there is a probability the defendant would commit
criminal acts of violence that would constitute a continuing threat to society. Williams, 273 S.W.3d
at 213; Alvarado v. State, 912 S.W.2d 199, 209 (Tex. Crim. App. 1995). 

 In deciding this special issue, the jury is entitled to consider all of the evidence admitted at
both the guilt and punishment phases of trial. Devoe v. State, 354 S.W.3d 457, 461 (Tex. Crim. App.
2011). The jury may also consider a variety of factors, including: (1) the circumstances of the
capital offense, including the defendant's state of mind and whether he was working alone or with
other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness
exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's
age and personal circumstances at the time of the offense; (6) whether the defendant was acting
under duress or the domination of another when he committed the crime; (7) psychiatric evidence;
and (8) character evidence. Keeton v. State, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The
circumstances of the offense and the events surrounding it may be sufficient in themselves to sustain
an affirmative answer to the future-dangerousness special issue. Devoe, 354 S.W.3d at 462; Hayes
v. State, 85 S.W.3d 809, 814 (Tex. Crim. App. 2002). An escalating pattern of violence or disrespect
for the law may also support a finding of future dangerousness. (2) A lack of remorse or evidence that
a defendant planned to kill again may likewise support a finding of future dangerousness. (3) The
future-dangerousness special issue focuses upon the character and internal restraints of the particular
individual, rather than the external institutional restraints of incarceration. Coble v. State, 330
S.W.3d 253, 268 (Tex. Crim. App. 2010). With these principles in mind, we turn to the evidence
placed before the jury at both phases of appellant's capital murder trial.

 At the guilt phase, the state presented evidence that appellant committed the instant offense
shortly after 8:00 p.m. on February 4, 2010. Appellant and his wife, Melissa Cole, had been
experiencing marital strife in the weeks preceding the killings. About a month before the shootings,
Melissa moved herself, the couple's two young sons (Piero, age ten, and Lucas, age two) and her
daughter from a prior relationship (Alecia "Desirae" Castillo, age fifteen) from the family home into
a small apartment.

 Following the move, Piero and Lucas continued to have contact with appellant, spending two
days a week with him. The boys had been staying with appellant for the two days immediately
preceding the killings. Piero testified that appellant seemed normal during this time and that he did
not see appellant consume any alcohol. (4) Shortly before returning the boys to Melissa that evening,
appellant took them out to eat. During the meal, appellant drank two beers. Appellant, who had
purchased a .22-caliber semi-automatic pistol the previous afternoon, told Piero during the meal that
if appellant or Melissa died, Piero should live with appellant's biological sister in Ecuador. (5) 

 When returning the boys after their visits, appellant usually called Melissa from the
apartment complex's parking lot to inform her that the children were back, but he did not enter the
apartment. On the evening of the murders, however, appellant parked his truck and went inside with
the boys. Desirae and Melissa were in the apartment. Chloe Mahalec, Melissa's nine-year-old niece
who often visited the family, was also present. 

 Appellant and Melissa began arguing in Melissa's bedroom. After Desirae complained about
the noise, appellant and Melissa went outside. The children remained inside the apartment. As the
adults' argument grew louder, Desirae pounded on the inside of the front door several times, telling
appellant and Melissa to be quiet. When Melissa began to scream, "Help me, help me," in fear,
Desirae opened the front door, again telling appellant and Melissa to be quiet. Desirae and Chloe
saw appellant shooting Melissa, who collapsed in the front doorway. Appellant continued firing at
Melissa when she was on the ground.

 Chloe ran to the kitchen to hide from appellant. Lucas stayed where he was, sitting on the
floor between the hall and entry to the kitchen, crying. Desirae fled to the back bedroom. Piero hid
in the bathroom attached to the same bedroom. From inside the bathroom, Piero heard four or five
"clicks" from the bedroom, and from her hiding spot in the kitchen, Chloe twice heard Piero yell,
"No." When Piero opened the bathroom door, he saw Desirae lying on the bedroom floor on her
side. Appellant was in the bedroom, holding a pistol and retrieving shell casings. (6) Without looking
at or speaking to Piero, appellant removed the magazine from the pistol, pocketed it, and ran out of
the bedroom, still holding the pistol. Appellant pointed the pistol at Chloe, but it only went "click-click" instead of "boom-boom." 

 Piero ran for help, but both Melissa and Desirae died at the scene. Two-year-old Lucas,
meanwhile, followed appellant to the parking lot. Appellant put Lucas in the front seat of his truck. 
Without restraining the child, appellant drove through the apartment complex at high speed and
rammed his truck through the automatic gate without waiting for it to fully open. Appellant went 
to his workplace, where he took $1,400 in cash from the safe and looked unsuccessfully for a vehicle
to exchange for his truck. Appellant then headed south on U.S. Highway 59, a major corridor
between Houston and Mexico.

 That same evening, Sgt. Chappell issued an "Amber Alert" for Lucas. Jose Mena, the Texas
Department of Public Safety (DPS) trooper who responded to the alert, apprehended appellant at
approximately 11:00 p.m. inside a Wharton County Walmart. Appellant, who had Lucas with him
inside the store, had just purchased 100 rounds of .22 caliber ammunition, as well as diapers and
some food items. Because he had heard that appellant had shot and killed two people, Trooper Mena
approached appellant from behind, with his service weapon drawn, as appellant was leaving the
store. When Trooper Mena seized appellant and instructed him not to move, a bystander removed
Lucas from appellant's shopping cart and took him inside the store. Appellant was arrested without
further incident.

 In appellant's truck, investigators found a large hunting knife inserted between the driver's
seat and center console. Underneath the console, with the magazine inserted, they found appellant's
.22 semi-automatic pistol. The magazine was empty, and no bullet was in the chamber. On the
passenger-side floorboard, investigators found a loaded shotgun and four bags containing the cash
from appellant's employer. 

 The state's firearm examiner, Joseph Colca, testified that the magazine had a ten-cartridge
capacity; with a bullet chambered, plus a full magazine, the weapon's total firing capacity without
reloading was eleven rounds. (7) He also told the jury about the multiple safety features that appellant
had to override to fire the weapon. 

 Following his arrest, appellant was taken before a magistrate in Wharton County and
informed of his constitutional rights. Before being transported to Harris County, appellant gave a
videotaped statement to Houston Police Department (HPD) Sergeants Robert Chappell and William
Bush, both of whom testified that appellant's general demeanor while in Wharton County was
"angry" and that he did not appear intoxicated. The trial court admitted part of the Wharton County
statement as State's Exhibit 8A, which was published to the jury. In that statement, appellant
asserted that the shootings were "not planned," but also asserted that the "kids weren't supposed to
see." Appellant also stated that, if things had gone right, he would have been dead already because
he had wanted the police to catch him or shoot him. Appellant said that he would have killed
himself, but he had no bullets.

 In Harris County, appellant gave a second videotaped statement to HPD Officer Xavier Avila,
which was admitted into evidence as State's Exhibit 9 and published to the jury. Appellant stated
that he and Melissa were fighting over money and whether the marriage had any chance of
continuing. Appellant hoped for a legal separation, but Melissa wanted a divorce. Appellant
asserted that Melissa was complaining that she was "broke," although he had been depositing money
for her into an account ever since she moved out. Appellant also stated that Melissa was impatient
because he had not yet obtained their tax refund, which she wanted to use to pay for a divorce. They
argued, and he started crying because Melissa would not agree to a separation rather than a divorce. 
Desirae came to the door of the bedroom, telling them that they were being too loud, so they went
outside.

 Appellant said that he had the pistol with him in his waistband and had been carrying it for
the last couple of days for protection and because it helped him sleep. When Melissa said that she
did not want to again discuss the possibility of a separation, appellant pulled the pistol from his
waistband, cocked it, and shot her from a very short distance. Appellant asserted that he did not
know how many times he shot Melissa. After Melissa collapsed, appellant stepped over her, went
to the back bedroom, and shot Desirae, who had been in the background "screaming at [him]" while
he shot Melissa. Appellant asserted that he had not planned any of the violence. Appellant stated
that he shot his wife because he was "angry and frustrated about the way everything was going." 
Regarding Desirae, appellant claimed that he shot her in a moment of anger. When he shot Desirae,
appellant was aware that Chloe was in the adjacent kitchen and that Piero was somewhere in the
same bedroom.

 The autopsies revealed that Melissa had been shot nine times: once in the head, six times
in the chest and abdomen, and twice in her right arm. The shot to her head and a contact-shot to her
abdomen were immediately life-threatening. Three of the remaining wounds to her chest and
abdomen were potentially fatal. The wounds to her arm were inflicted at very close range and were
consistent with pushing the barrel of the gun away. At least six of the bullets traveled in a downward
trajectory through her body, consistent with testimony that appellant continued to fire at Melissa after
she had fallen to the ground. Desirae sustained two gunshot wounds to the torso, either one of which
could have been the cause of death. Both bullets traveled in a downward trajectory, consistent with
appellant firing at Desirae from above.

 At the punishment phase, the jury heard evidence concerning appellant's interactions with
female intimate partners, family members, friends, coworkers, and strangers. It additionally heard
evidence regarding appellant's criminal history before and after the instant offense, as well as
evidence concerning his prior bad acts and character. 

 Leticia Leal testified that she and appellant dated off and on through high school and for a
few years beyond graduation. Leal recalled that the relationship was good at first, but deteriorated
over time. In the spring of 1989, after graduation, appellant and Leal were dating other people but
trying to remain friends. Appellant entered the K-Mart store where Leal was working and said hello
when he saw her. The encounter was initially friendly, but Leal indicated that she could not continue
talking because she was working. Appellant, however, did not leave. Appellant saw that Leal had
a hickey on her neck, became upset, and wanted to discuss it. Leal repeated that she could not talk
to him then and headed to the store's back warehouse. Appellant followed Leal into the warehouse
area, pushed her against a wall, and grabbed her by the neck. Appellant did not release Leal until
her coworker intervened and told appellant to leave. Leal, who had at first been shocked and then
frightened by the assault, left work after the incident.

 Either the same night or the next day, appellant drove to the home where Leal lived with her
parents and sisters. Leal stayed inside while one of her sisters called the police. Another sister, Ann,
who was pregnant, went outside. Appellant, who had a handgun, grabbed Ann. Leal's father and
brother-in-law tackled appellant, took the weapon away, and told appellant to leave. Leal made a
police report, but appellant's mother, Hazel Cole, convinced her not to pursue charges.

 Collete Rives testified that she met appellant in 1988 when they were both high school
seniors and working at the same place. After a few months, they began dating. Like Leal, Rives
testified that the relationship with appellant was initially good. After about five months of dating,
she became pregnant by appellant. Rives and appellant were not dating when she subsequently
learned of the pregnancy and informed appellant. Appellant told Rives that "he would pay for it but
not claim [the child]." Appellant was not present when his daughter, Brittnie, was born in April
1990, did not provide child support until ordered by a court to do so, and did not spend much time
with Brittnie, even after appellant and Rives reconciled in April or May 1992. When Rives became
pregnant again in June 1992, appellant insisted that Rives terminate the pregnancy.

 Appellant and Rives split again, but had reconciled by late July or early August 1993 when
Rives learned that she was pregnant by appellant with their son, James. This time, appellant
promised to stay with Rives. In September 1993, when Rives's pregnancy was two months along,
they spent the evening at the bar run by appellant's mother, Hazel. They then went to Hazel's house,
where they were spending the night. Rives and appellant argued. Rives did not take any physical
action against appellant. Appellant, however, who knew Rives was pregnant, suddenly punched her
hard in the stomach. The blow hurt, and Rives lay down on the bed and began to cry. Besides being
in pain, Rives was very concerned about the unborn baby. After hitting her, appellant lay down on
the bed and went to sleep, although he apologized the next day. 

 Rives stayed in a relationship with appellant until they broke up again a few days before
November 24, 1993. At that date, Rives was about four-and-a-half months along and visibly
pregnant. Carl Freeman was appellant's longtime friend and neighbor. While dating appellant, Rives
had frequently spent time with Freeman and his girlfriend. On November 24, Rives visited Freeman
and his girlfriend at Freeman's house. Appellant knocked at the front door, asking to talk to Rives. 
When Rives went to the door, appellant asked her about a diamond ring that he had given her,
wanting it back. When Rives said that she did not have the ring with her, appellant grabbed her arm
and forced her outside. He took Rives over to his Chevy Blazer, which was parked in Freeman's
driveway, and bent her on her back over the hood. Appellant put his left hand across Rives's chest
to hold her down, reached for a shotgun with his right hand, and held it to Rives's forehead. Rives
struggled with appellant and cried for help. Appellant did not say anything, but just looked angry. 
Rives feared that appellant was going to shoot her. They struggled over the shotgun until appellant
put the weapon down and swung Rives forcefully across the yard. Appellant then came over to
where Rives landed and kicked her repeatedly in the stomach. 

 Freeman testified that he came running from the house in response to Rives's cries. He
knocked appellant down when appellant was kicking Rives, and he yelled for Rives to get to the
house and call 9-1-1. Freeman saw Rives enter the house. When Freeman turned back to appellant,
appellant was pointing a 12-gauge shotgun at him. Freeman told appellant that if appellant was
going to shoot him, appellant would have to shoot him in the back. Freeman turned around and
quickly walked back to the house. Freeman heard a shot behind him and was terrified. (8) Freeman
and Rives waited inside the house until several police cruisers arrived. Rives and Freeman both gave
statements to the police. Rives received medical treatment and was released after a determination
that the baby was unharmed.

 Appellant was arrested and indicted for two counts of aggravated assault with a deadly
weapon. But Rives reconciled with appellant, and he persuaded her to sign "a piece of paper" so that
he would not go to jail. Appellant told Rives that if he were in jail, he could not help her with the
children. Appellant also apologized and promised that he would not ever do it again. Rives testified
that she did not knowingly agree to drop the charges against appellant; by signing the document, she
thought that she was merely agreeing that he should not go to jail. Rives believed at the time that
appellant should be punished in some way for what he had done, but she did not want that
punishment to include jail time. 

 Freeman testified that Hazel called him within one week of the incident. Following the
conversation with Hazel, Freeman called the police department and asked to drop the charges against
appellant. The charges against appellant were reduced from aggravated assault with a deadly weapon
to the offense of terroristic threat. Appellant pleaded guilty to the reduced charge on August 26,
1994.

 Rives testified that no physical abuse occurred between the incident at Freeman's house and
the birth of James in April 1994. But in November 1994, appellant and Rives traveled to Ecuador
for her to meet his biological family. A physical incident occurred there after Rives and appellant
spent the evening at a bar. Rives testified that, although she and appellant both drank alcohol that
evening, she was not drunk. She could not say whether appellant was intoxicated. After returning
to their sleeping quarters at appellant's aunt's house, appellant became very angry and hit Rives
twice in the stomach. Although the blows hurt and she was very upset, Rives lay down on the bed
because she had nowhere to go if she left the premises. Appellant stayed in the room and did not say
anything. The next morning, he apologized.

 Appellant hurt Rives again in March 1995, when Rives and Hazel threw a small surprise
party for him at Hazel's bar. Appellant initially seemed happy at the party, but matters changed
when a physical altercation developed between two patrons. Appellant moved outside with the
combatants and stood next to them, talking to them. Hazel asked Rives to get appellant away from
the place, and Rives yelled at appellant, "Let's go." Eventually, appellant joined Rives at her car. 
Rives was standing outside the car on the passenger side, facing outward, with the door open. 
Appellant grabbed Rives by the arm, told her never to yell at him like that in front of his friends, and
pushed her backward. After Rives fell back into the seat with her feet still on the ground, appellant
slammed the car door across her legs. Rives testified that having the door slammed against her legs
hurt and that she still bore an indentation in one leg from the incident. Afterward, Rives told
appellant that he needed help and if he ever hit her again, she would leave him. Rives testified that
appellant went to counseling, but she did not know for how long.

 Appellant hit Rives again six months later, in September 1995, when the two traveled to San
Francisco on a business trip. On the first night there, appellant became drunk and punched Rives
in the stomach several times when she would not have sexual intercourse with him. Although the
punches hurt and she was scared, Rives did not leave because appellant took her plane ticket and
money. When they returned to Houston, Rives ended the relationship.

 Rives testified that when appellant was physically abusive he would also be verbally abusive. 
For example, he would tell Rives that no one would want her because she had two children and was
not married. Rives also testified that appellant's violence was not just directed at her. She and
appellant went to Hazel's bar frequently, and while there, Rives saw appellant engage in more than
one bar fight. The fights ensued when appellant felt that someone had disrespected him. Rives
testified that appellant would react to perceived disrespect by getting angry. 

 The state presented additional evidence concerning appellant's participation in fights through
the testimony of two police officers who arrested appellant in September 1993 and June 1997 for
public intoxication and disorderly conduct. Both arrests stemmed from reports of fighting. The
arresting officer for the 1993 incident reported that appellant was intoxicated and abusive. The
arresting officer for the June 1997 incident reported that appellant was highly intoxicated, shouted
obscenities, and exhibited an aggressive demeanor. The jury also heard testimony that appellant had
been convicted in 1991 for Driving While Intoxicated (DWI).

 Appellant's daughter, Brittnie Rives, was twenty-one when she testified at his trial. Before
the age of fourteen, Brittnie visited appellant twice a month and recalled when he began dating and
later married Melissa. Brittnie lived with the couple from age fourteen to seventeen, when she
moved out of appellant's home.

 Brittnie testified extensively regarding appellant's manner of disciplining her. She testified
that appellant had sometimes administered appropriate discipline. But most of the time, appellant
would become very violent and aggressive when he punished her. When Brittnie was six years old
and in appellant's care, he became locked out of his residence one evening. The garage door was
open slightly and appellant wanted Brittnie to squeeze through the space, go through the garage to
the laundry room, enter the house, and let him in. Brittnie was afraid to enter the garage because it
was dark and contained snakes, spiders, and bugs. When Brittnie resisted appellant's directive, he
tried to force her under the garage door. In the process, appellant pushed Brittnie face-first into the
concrete. Brittnie sustained painful scratches to her face when it hit the concrete. When Brittnie was
between seven and eight years old, appellant threw her down a hallway and she received carpet burns
when she skidded to a stop. When Brittnie was in high school, appellant would choke her, grab her
under her arm and throw her, and use physical force to restrain her. When she was fourteen to fifteen
years old, appellant threw Brittnie into a television set as a way of disciplining her. The force that
appellant used re-tore ligaments that Brittnie had previously torn while playing soccer.

 Appellant provided alcohol and marijuana to Brittnie and her friends and drank and smoked
with them. After one such occasion, Brittnie was drunk, asleep on the couch, and alone at home with
appellant. When she woke briefly during the night, appellant was on top of her, fondling her genitals
under her pants. Brittnie went back to sleep, but confronted appellant the next morning. Appellant
denied the accusation several times, but when Brittnie said that she would tell someone if he did it
again, appellant said, "Okay," and asked her not to tell Melissa.

 Appellant sometimes turned on Melissa when she interfered with his disciplining of Brittnie. 
On one of these occasions, appellant pinned Melissa against a wall. Brittnie testified that she
witnessed many negative interactions between appellant and Melissa. Appellant was usually
intoxicated when he came home and was verbally abusive toward Melissa, calling her "bitch" and
"lazy ass." He also frequently grabbed Melissa under the arm. In 2004, when Melissa was six
months pregnant with Lucas, appellant pinned her against the wall. Brittnie testified that appellant
sometimes moderated his behavior when he was sober, but his violent and abusive conduct was not
limited to times when he was intoxicated.

 Brittnie testified that she had a good relationship with both Melissa and Desirae and
maintained it even after moving out of the house at age seventeen to escape from appellant's abuse. 
About one week before Melissa moved out, she spoke to Brittnie about "an incident" that had
recently occurred. Melissa was crying and scared. On the day of the move, Melissa spoke to Brittnie
of a second, intervening incident. As she had been during the previous conversation, Melissa was
"very emotional," "crying," and "scared." Brittnie helped Melissa move. Melissa wanted to leave
the house quickly, before appellant returned from work, and she took only a minimal amount of
belongings for herself and the children. Brittnie also testified that she noticed a change in Desirae
in the period preceding the murders. Desirae expressed "a lot of hatred" toward appellant and stayed
in her room or otherwise avoided appellant when he was around.

 Brooke Phillips, Melissa's sister, testified at the punishment phase and gave similar accounts
of Melissa's and Desirae's demeanor and behavior in the time preceding the shootings. Phillips
stated that she discussed personal topics with Melissa and had been aware of her sister's plan to
move. Phillips testified that Melissa "cried a lot, . . . [and] was nervous [and] scared" when she
decided to leave with the children. After the move, Melissa seemed more at ease. Through Phillips
and another witness, the state presented evidence that, in early November 2009, Melissa had
removed four handguns and a rifle from the family home and pawned them.

 Regarding appellant's treatment of Desirae, Phillips recalled an incident in 2008 when
Desirae was about thirteen years old. Phillips's extended family, including Melissa, appellant, and
their children, were vacationing together at a property owned by Phillips's grandmother. One
evening, when they were playing cards on the patio, appellant became angry over something
innocuous that Desirae said. He jumped from his seat and grabbed Desirae by the upper arm. 
Desirae seemed stunned and grew quiet. When Phillips confronted appellant about his behavior, he
did not respond. As Desirae entered her teenage years, she remained communicative with Melissa
and Phillips, but would withdraw when appellant was around. 

 The state additionally presented evidence that in June 2011, while appellant was incarcerated
in the Harris County Jail awaiting trial for capital murder, a routine cell search revealed that he was
hiding contraband pills in a baggy inside a jar of peanut butter. Appellant admitted that he purchased
the pills from another inmate in administrative segregation and had managed to keep them in his cell,
undetected, for over six months. The discovery of the contraband pills led to appellant's conviction
for possession of a controlled substance. 

 Appellant's punishment evidence consisted of testimony from his adoptive and biological
family; former coworkers and employees; the psychotherapist who treated him immediately before
the offense; a psychiatrist; and an expert regarding the system of inmate classification at the Texas
Department of Criminal Justice, Criminal Institutions Division (TDCJ). On cross-examination of
appellant's family and friends, the state elicited evidence that appellant grew up in an extremely
supportive, loving environment, in which nothing important was lacking, and he was taught right
from wrong and how to behave. Both Hazel and Jim Cole admitted that appellant's temper had
caused him problems and that they had intervened to smooth things over for him. Jim admitted that
appellant had been fired from two different jobs, once due to appellant's conflict with a new
manager. Hazel admitted that appellant could be hot-tempered and had been verbally abusive to her,
although he apologized afterward. Hazel also admitted that she had helped appellant try to come up
with ideas for defending himself against the capital-murder charges. One of those ideas was to
determine whether Melissa had drugs in her system when she died.

 On cross-examination of appellant's former coworkers, the state elicited evidence that cast
doubt upon appellant's theory that alcohol abuse or addiction played a pivotal role in appellant's
commission of the offense. Appellant was never known to drink on the job or arrive at work
intoxicated, and while working, he functioned at a high level. Despite being sober while at work,
appellant consistently had some difficulty dealing well with customer complaints because he took
customer dissatisfaction too personally. The state noted that appellant had physically intimidated
a male employee by lifting the employee off his feet by the collar, and he had once reprimanded an
employee so severely that he reduced the employee to tears. Although appellant sometimes drank
alcohol to excess at company functions, his drinking on those occasions did not stand out to
witnesses as particularly noteworthy. And even when drinking to excess at those functions,
appellant's behavior did not turn violent. 

 Sharon Boyd, a psychotherapist, testified that she met with appellant on January 26, 2010,
and again on the afternoon of February 3, 2010, the day before the offense. On January 26, when
she learned that the reason for his visit was a recent marital separation, Boyd evaluated appellant for
homicidal and suicidal ideation and psychosis. Appellant denied having any such feelings. Boyd
concluded that appellant was not homicidal, suicidal, or psychotic, although he was mildly depressed
and mildly anxious. Appellant, who then reported one week of sobriety, did not comply with Boyd's
recommendations that he attend recovery meetings for alcoholics and enter an outpatient substance
abuse program. 

 On the afternoon of February 3, Boyd met with appellant for a second time. At this session,
appellant specifically denied needing any help regarding homicidal or suicidal feelings or psychosis. 
Although Boyd observed that appellant was tearful, more anxious, and more depressed, she
concluded that no homicidal or suicidal ideation or psychosis was present. She categorized appellant
as "moderately depressed." Appellant, who then reported more than two weeks of sobriety, again
declined to pursue Boyd's treatment recommendations, although he scheduled a third appointment
with her. The session ended at 1:45 p.m. Appellant bought the murder weapon and ammunition less
than an hour later and committed the murders the next evening. 

 Terry Rustin, a psychiatrist appointed to assist the defense, interviewed appellant. Rustin
testified that appellant, who showed "a great deal of denial" during the interview, was alcohol
dependent as well as an alcoholic. Rustin opined that, at the time of the murders, appellant was
experiencing an adjustment disorder with a depressed mood stemming from Melissa's departure. 
Rustin opined that appellant's alcohol dependence, alcoholism, and period of abstinence from
alcohol immediately before the shootings, together with appellant's adjustment disorder, played a
role in the commission of the offense. Rustin stated that repeated episodes of withdrawal from
alcohol use by an alcoholic leads to "more brain damage and more emotional damage" than staying
continuously intoxicated. Rustin asserted that appellant's alcohol dependence and alcoholism could
be treated even if appellant were imprisoned. On cross-examination, Rustin testified that appellant
had poor impulse control, which could either be caused or exacerbated by alcohol abuse. Rustin also
acknowledged that, at the Harris County Jail while awaiting trial, appellant had been discovered in
possession of contraband drugs that would produce intoxicating effects similar to alcohol. 

 Through Rustin, appellant successfully offered into evidence the records of his medical
treatment while in the Harris County Jail awaiting trial for capital murder. The records established
that appellant admitted to "getting depressed and mad" in jail and that he refused to take medications
prescribed by jail psychiatrists.

 Viewed in the light most favorable to the verdict, the foregoing evidence is sufficient to
sustain the jury's affirmative answer to the future-dangerousness special issue. Initially, we note the
circumstances of the offense and the events surrounding it. See Devoe, 354 S.W.3d at 462; Hayes,
85 S.W.3d at 814. They support rational inferences of cold calculation, premeditation, and a wanton
and callous disregard for human life. Appellant purchased the murder weapon the day before the
homicides. See Dinkins, 894 S.W.2d 330, 360-61 (Tex. Crim. App. 1995) (concluding that the
defendant's purchase of the murder weapon a day before a scheduled meeting with one of the victims
supported a reasonable inference of pre-planning). Immediately before the shootings, appellant
advised his ten-year-old son where to live if one or both of his parents died. Appellant also departed
from his normal practice of merely dropping the boys off in the parking lot. Instead, appellant
entered the small apartment, which was occupied by Melissa, the teenaged Desirae, and three
children aged 10 years and younger, with a fully loaded semi-automatic pistol in his waistband. The
fact that appellant "knowingly and willingly placed himself in, and sought after, circumstances
facilitating homicide . . . demonstrates a callousness and lack of reflection about taking human life[,]
which tends to increase the probability that he is a future danger." See Rachal, 917 S.W.2d at
807-08.

 Although aware that he was in close proximity to three young children, appellant completely
emptied the pistol's magazine into his victims, inflicting multiple fatal wounds at close range. See
Dinkins, 894 S.W.2d at 360 ("Appellant's infliction of multiple wounds at close range indicates a
wanton and callous disregard for human life."). Appellant asserted that he did so because he was
"angry and frustrated." Even if the jury had been inclined to find that Melissa's and Desirae's
murders represented an isolated incident of rage, it "could [have] rationally conclude[d] from the
results of appellant's isolated incident of rage that his rage is of such an uncontrollable and extreme
nature that he is a continuing danger to society." Sonnier v. State, 913 S.W.2d 511, 517 (Tex. Crim.
App. 1995).

 Desirae's killing is particularly telling. By appellant's own admission, he stepped over
Melissa's body, followed Desirae into the back bedroom, and inflicted two mortal wounds because
he was angry that the teenager was screaming at him. Evidence of such wanton, senseless killing
supports the inference that appellant is a continuing danger to society. See Coble, 330 S.W.3d at 268
(discussing the future-dangerousness issue's emphasis on the defendant's internal restraints);
Sonnier, 913 S.W.2d at 517. Given the evidence in the record that (1) Desirae and Chloe both
witnessed the first shooting, (2) appellant shot and killed Desirae, and (3) appellant pointed his pistol
at Chloe and made it go "click click" instead of "boom boom," the jury could also reasonably infer
that appellant killed Desirae to eliminate her as a witness and would have killed Chloe, too, if any
bullets had remained in his pistol. We have previously found killings motivated by the desire to
eliminate witnesses to reflect a wanton and callous disregard for life, such that the circumstances of
the offense are sufficient by themselves to support a finding of future dangerousness. Dinkins, 894
S.W.2d at 360. Alternatively, appellant's targeted aggression toward the only two children at the
scene who were biologically related to Melissa, but not to him, supports a finding of vicious
calculation. We conclude that the circumstances of the offense were sufficient to support the jury's
affirmative answer to the future-dangerousness special issue.

 We also observe that, rather than turning himself in after the shootings, appellant--who later
professed a desire that he would be caught and killed by police--fled the scene at high speed with
an unrestrained two-year-old in the vehicle thereby prompting a manhunt, stole a large sum of cash
from his employer, and intending to commit "suicide by cop," bought additional ammunition for his
semiautomatic pistol. Such actions reflect forethought and intent to avoid capture, as well as a
disregard for the lives of his pursuers and innocent others, including his own child, Lucas. See
Smith, 74 S.W.3d at 872. The jury could further infer a lack of remorse from appellant's words and
demeanor while speaking about the murders to Sgts. Chappell and Bush, a few hours after the
shootings. Appellant appeared angry and expressed no remorse for having killed either of the two
victims. Although appellant expressed regret that his sons had witnessed the shootings, he did so
with a slight shrug and the statement, "Shit happens." Cf. Estrada, 313 S.W.3d at 28 n.9 (jury could
reasonably infer lack of remorse from the evidence of appellant's demeanor, including his complaint,
not long after he had brutally murdered his wife and their unborn child, that she "had ruined his
life").

 Moreover, appellant had a criminal history that included convictions for DWI in 1991, public
intoxication in 1993 (stemming from fighting), terroristic threat in 1994, and public intoxication and
disorderly conduct in 1997 (again based on fighting). Although we remain cognizant that each case
must be determined on its own facts, Estrada, 313 S.W.3d at 284, we have found criminal records
that are arguably less serious than appellant's to support a jury's finding that a probability of future
dangerousness exists. See, e.g., Lucio v. State, 351 S.W.3d 878, 904 (Tex. Crim. App. 2011). Here,
the evidence further reasonably suggested that, due to the intervention of appellant's adoptive parents
and appellant's manipulation of Rives, appellant's conviction record under-represented the
seriousness of his criminal history, especially his assaultive behavior and use of a deadly weapon. 
Cf. Williams v. State, 937 S.W.2d 479, 484 (Tex. Crim. App. 1996) (a prior conviction for
aggravated assault, a violent felony, is persuasive evidence of future dangerousness); see Barley v.
State, 906 S.W.2d 27, 30-31 (Tex. Crim. App. 1995) (explaining that even a criminal history
comprised of offenses that are not overtly violent can lead a reasonable juror to find a probability of
future dangerousness when the offenses show an escalating and on-going pattern of disrespect and
continued violations of the law). 

 Two former girlfriends, Leal and Rives, testified about the abuse he inflicted upon them. 
There was testimony that appellant physically and verbally abused Melissa, Desirae, and Brittnie,
engaged in bar fights, and threatened his neighbor, Freeman, with a gun. Even his mother, who
acknowledged that she would do anything to protect appellant, admitted that he had a temper and
was sometimes verbally abusive to her.

 The evidence, viewed in the light most favorable to the verdict, was sufficient to support the
jury's affirmative answer to the future-dangerousness special issue. Point of error ten is overruled. 

Admissibility of Oral Statements

 In points of error one through four, appellant challenges the trial court's ruling on his motion
to suppress the videotaped statement he made to Sgts. Chappell and Bush in Wharton County and
his later videotaped statement to Officer Avila in Harris County. Appellant contends that the
admission of his statements violated federal law under Miranda v. Arizona, 384 U.S. 436 (1966),
and state law under Article 15.17.

 We employ a bifurcated standard of review when reviewing claims concerning Miranda
violations and the admission of statements made as a result of custodial interrogation. Pecina v.
State, 361 S.W.3d 68, 78-79 (Tex. Crim. App. 2012) (citing Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997)). We measure the propriety of the trial court's ruling under the totality of
the circumstances, extending almost total deference to the trial court's rulings on questions of
historical fact, as well as on its application of law to fact questions that turn upon credibility and
demeanor. Id. at 79; Leza v. State, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). We review de
novo the trial court's rulings on questions of law and its rulings on application of law to fact
questions that do not turn upon credibility and demeanor. Pecina, 361 S.W.3d at 79; Leza, 351
S.W.3d at 349. We view the record in the light most favorable to the trial court's conclusion and
reverse the judgment only if it is outside the zone of reasonable disagreement. State v. Dixon, 206
S.W.3d 587, 590 (Tex. Crim. App. 2006). On appeal, this Court "does not engage in its own factual
review but decides whether the trial judge's fact findings are supported by the record. If the trial
court's findings are supported by the record," we are "not at liberty to disturb them, and on appellate
review, we address only the question of whether the trial court improperly applied the law to the
facts." Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); see Dixon, 206 S.W.3d at
590 ("We will sustain the lower court's ruling if it is reasonably supported by the record and is
correct on any theory of law applicable to the case.").

 The record reflects that the trial judge held a hearing on appellant's motion to suppress his
statements. Trooper Mena, Justice of the Peace Cynthia Kubicek, Sgts. Bush and Chappell, and
Officer Avila testified at the hearing. The evidence showed that, after Trooper Mena arrested
appellant at a Wharton County Walmart, he took appellant before Wharton County magistrate
Kubicek, and she informed appellant of his rights. (9) In Wharton County, appellant gave a videotaped
statement to Sgts. Chappell and Bush. Appellant was later transported to Harris County, where he
gave a second videotaped statement to Officer Avila. The state introduced a number of exhibits for
the trial court's consideration, including a completed and signed document captioned, "Wharton
County Sheriff's Department Magistrate's Warning Certificate--Article 15.17 Texas Code of
Criminal Procedure," and videotaped recordings of appellant's entire Wharton and Harris County
statements. At the close of the evidence and after hearing argument, the trial court took appellant's
motion to suppress under advisement. It subsequently ruled that it would grant the motion in part
and deny it in part. The trial court denied the motion as to the beginning of appellant's Wharton
County statement. It granted the motion as to the later part of the Wharton County statement,
starting from appellant's statement, "I don't want to talk any more," through to the end. (10) But it
denied the motion altogether concerning appellant's Harris County statement to Officer Avila. The
trial court later supplemented the record on appeal with written findings of fact and conclusions of
law concerning the voluntariness of appellant's statements. (11)

 In its written findings, the trial court found Trooper Mena, Justice of the Peace Kubicek, Sgts.
Chappell and Bush, and Officer Avila to be credible and reliable witnesses. It made these factual
findings regarding appellant's magistration:

 22. Magistrate Kubicek first came into contact with Defendant Cole at
approximately 1:15 [a.m.] on February 5, 2010, at the Wharton County jail. 
Defendant Cole indicated to Magistrate Kubicek he understood why he was
in custody.


 23. Magistrate Kubicek confirmed that Defendant Cole could speak and
understand English. Magistrate Kubicek observed Defendant Cole to be
awake, alert, and oriented.


 24. Magistrate Kubicek read the warnings reflected on state's exhibit one (12) to
Defendant Cole.


 25. Defendant Cole appeared to understand the warnings read to him by
Magistrate Kubicek and he did not ask any questions about the rights
Magistrate Kubicek read to him from state's exhibit one.


 26. Defendant Cole signed the warnings reflected on state's exhibit one in the
presence of Magistrate Kubicek.


 27. While advising Defendant Cole of the warnings reflected on state's exhibit
one, Magistrate Kubicek further advised Defendant Cole that since the
offense did not occur in Wharton County that he would not be appointed an
attorney there but that he could retain his own or one would be appointed to
him in Harris County.


 28. Defendant Cole signed state's exhibit one acknowledging his right to request
appointed counsel. However, Defendant Cole did not request appointed
counsel while in Wharton County, Texas.

 

 29. Defendant Cole did not request the appointment of counsel at any time while
in Wharton County.


 Regarding appellant's interview with Sgts. Chappell and Bush in Wharton County, the trial
court found:

 21. Both Sgt. Chappell and Sgt. Bush were present when Magistrate Kubicek
read Defendant Cole magistrate warnings.


***


 30. Sgt. Chappell and Sgt. Bush observed Defendant Cole to be awake, alert, and
oriented when he signed the magistrate form reflected in state's exhibit one.


 31. After the magistrate warnings were read and signed, Sgts. Chappell and Bush
took custody of Defendant Cole and entered an investigator's office at the
Wharton County Sheriff's Office with Defendant Cole at approximately 1:44
am on February 5, 2010 and Sgt. Chappell advised Defendant Cole of his
Miranda rights as reflected on state's exhibit 8. (13)


 32. Sgt. Chappell advised Defendant Cole that he had the right to remain silent
and not make any statement at all; that any statement he made may be used
against him at his trial; that any statement he made may be used as evidence
against him in court; that he had the right to have a lawyer present to advise
him prior to and during any questioning; that if he was unable to employ a
lawyer he had the right to have a lawyer appointed to advise him prior to and
during any questioning; [and] that he had the right to terminate or stop the
interview at any time.


 33. Defendant Cole indicated he understood each right read to him by Sgt.
Chappell. No promises or threats were made to Defendant Cole. Defendant
Cole did not request a lawyer after Sgt. Chappell read the Miranda rights. 


 34. After advising Defendant Cole of his rights[,] Sgt. Chappell asked Defendant
Cole if he wanted to talk about the events that occurred.


 35. Defendant Cole replied, "Tell me what you know and I'll talk about it."

 

 36. After Sgt. Chappell explained that was not the way he would proceed but
rather wanted to hear the Defendant's side of what happened[,] Defendant
Cole responded, "It's not going to happen tonight."


 37. Sgt. Chappell then responded with[,] "It's not going to happen tonight?" 
Defendant Cole then said no and requested water and his shoes.

 

 38. After Defendant Cole said[,] "It's not going to happen tonight," Sgts.
Chappell and Bush stopped the questioning because they thought that
statement was an invocation of Defendant Cole's right to remain silent.

 

 39. As Sgt. Chappell started to leave the investigator's office to get the water and
shoes, Defendant Cole volunteered, "You're right about one thing,"
reinitiating discussion of the investigation with the two sergeants.

 

 40. Sgt. Chappell responded with[,] "Pardon me." Defendant Cole then stated,
"You're right about one thing. It was not planned." Sgt. Chappell then left
the investigator's office.


 41. While Sgt. Chappell was out of the office, Sgt. Bush engaged in a general
discussion with Defendant Cole but did not ask him any questions.


 42. After providing Defendant Cole with water and shoes, Sgt. Chappell asked
Defendant Cole if he was ready to go and Defendant Cole responded[,]
"Ready to go to Harris County."


 43. As Sgt. Chappell asked for car keys, Defendant Cole reinitiated a discussion
about the case again and asked, "What do y'all want to know? What do I
need to tell you?" Sgt. Chappell answered, "What happened."


 44. Thereafter, Sgt. Chappell and Defendant Cole engaged in a discussion
wherein Chappell advised Defendant Cole of the source of his information
and Defendant Cole expressed his opinion about the quantity of evidence
obtained by Chappell.


 45. After continuing to engage in a discussion about the case with Sgt. Chappell
and Sgt. Bush, Defendant Cole again invoked his right to remain silent when
he stated, "I do not want to talk anymore." After Defendant Cole Defendant
Cole stated that he did not want to talk anymore he immediately began to
volunteer statements expressing his desire for the police to kill him. Chappell
and Bush did not ask Defendant Cole any other questions at that time.


 46. Immediately after Defendant Cole stated he did not wish to talk anymore,
Chappell and Bush did not ask Defendant Cole any questions at that time.
Defendant Cole, however, continued to talk[,] expressing his desire to die,
concern for his children[,] and stating everything is gone.


 47. Sgts. Chappell and Bush then continued to discuss the case further with
Defendant Cole, and engaged in a general discussion with Defendant Cole
about the offense, his work, his wife and his children. During the
discussion[,] Chappell and Bush asked Defendant Cole questions about the
offense.


 48. Sgt. Chappell and Sgt. Bush concluded their interview with Defendant Cole
in Wharton County at approximately 2:12 [a.m.] and then drove him to the
Houston Police Department (HPD) homicide office. Upon arrival at HPD[,]
Chappell and Bush turned over custody of Defendant Cole to Sgt. Avila at
approximately 4:30 [a.m.] on February 5, 2010.

 Concerning the interview with Officer Avila in Harris County, the trial court found:

 49. Sgt. Avila observed Defendant Cole to be awake, alert and oriented.


 50. Approximately three hours passed between Defendant Cole's invocation of
his right to silence in Wharton County and when he was again interviewed by
Sgt. Avila.


 51. An HPD crime scene unit officer made contact with Defendant Cole in the
homicide office and tested his hands, took custody of his clothes[,] and
photographed him.


 52. At approximately 5:05 [a.m.] on February 5, 2010, Sgt. Avila read Defendant
Cole his Miranda rights as reflected on state's exhibit nine.


 53. Sgt. Avila advised Defendant Cole that he had the right to remain silent and
not make any statement [and] that any statement he made may be used against
him at his trial; that any statement he made may be used as evidence against
him in court; that he had the right to have a lawyer present to advise him prior
to and during any questioning; [and] that he had the right to terminate the
interview at any time.


 54. Defendant Cole verbally indicated he understood each right and placed his
initials next to each right on the warning form reflected in state's exhibit
nine.


 55. After Sgt. Avila advised Defendant Cole of his rights, Defendant Cole
invoked his right to counsel. (14)

 56. Sgt. Avila immediately ceased any attempt to interview [appellant],
terminated the interview[,] and left the interview room to turn off the video
recording device.


 57. After turning off the recording device, Sgt. Avila returned to the interview
room in which Defendant Cole was seated and began to explain the transport
process to Defendant Cole.


 58. After Sgt. Avila returned to the interview room, Defendant Cole reinitiated
further discussion about the case when he asked if his ten-year-old son would
have to testify.

 59. Sgt. Avila answered Defendant Cole by stating it was possible.


 60. Defendant Cole then advised Sgt. Avila that he changed his mind and wanted
to give a statement about shooting his wife and stepdaughter.


 61. Sgt. Avila again left the interview room to again turn on the video recording
device.


 62. After turning on the video recording device, Sgt. Avila returned to the
interview room in the homicide office and asked Defendant Cole to confirm
that a few minutes earlier he was advised of his rights and asked to initial
each.


 63. Defendant Cole confirmed his rights were read to him and that he understood
each right.


 64. Sgt. Avila reminded Defendant Cole that earlier he invoked his right to an attorney
and Defendant Cole responded he changed his mind and further stated he was doing
so voluntarily.

 

 65. Sgt. Avila again read Defendant Cole his Miranda rights as reflected on
state's exhibit nine.

 

 66. Defendant Cole again verbally indicated that he understood each right.

 

 67. Defendant Cole confirmed that he was initiating further conversation with
Sgt. Avila.

 

 68. Defendant Cole then freely and voluntarily waived his rights and gave a
voluntary statement as reflected on state's exhibit nine.

 

 69. Sgt. Avila did not force, threaten[,] or promise anything in exchange for
Defendant Cole's statements on state's exhibit nine.

 In its conclusions of law, the trial court determined that appellant freely and voluntarily
signed the warnings read to him by the magistrate judge, after acknowledging that he understood the
warnings; when Sgt. Chappell subsequently read him his Miranda rights, appellant acknowledged
that he understood those rights; and appellant never invoked his right to counsel while in Wharton
County. The trial court concluded that appellant invoked his right to silence in Wharton County
when he stated, "It's not going to happen tonight." (15) It further concluded that Sgts. Chappell and
Bush scrupulously honored that invocation of appellant's right to silence and ceased questioning him
until appellant re-initiated discussion of the case by stating, "You are right about one thing. It was
not planned." The trial court also concluded that appellant voluntarily waived his Miranda rights
when he re-initiated a discussion about his case with Sgts. Chappell and Bush, and that it was only
after appellant's re-initiation of the discussion that Sgts. Chappell and Bush resumed the interview. 

 However, the trial court concluded that appellant unequivocally and unambiguously invoked
his right to silence again in Wharton County when he stated, "I do not want to talk anymore," and
that Sgts. Chappell and Bush did not honor appellant's re-invocation of that right. The trial court
thus determined that appellant's subsequent statements to Sgts. Chappell and Bush in Wharton
County after the re-invocation of his right to silence were recorded in violation of that right. In
contrast, the trial court determined that appellant's statements to Sgts. Chappell and Bush in Wharton
County preceding the re-invocation of his right to silence were freely and voluntarily given under
Article 38.22. It also determined that the taking of those statements did not violate appellant's rights
under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution or Article 1,
Section 10, of the Texas Constitution. 

 Concerning appellant's Harris County statement to Officer Avila, the trial court concluded
that the officer scrupulously honored appellant's invocation of the right to counsel by ceasing all
questioning and terminating the interview. It further concluded that appellant re-initiated discussion
about his case when he asked Officer Avila whether appellant's son would have to testify and then
volunteered that he had changed his mind and wished to give a statement.

 In point of error one, invoking Miranda and Moran v. Burbine, 475 U.S. 412 (1986),
appellant alleges that he did not voluntarily, knowingly, and intelligently waive his right to counsel
before Sgts. Chappell and Bush questioned him in Wharton County. (16) Appellant concedes that the
magistrate read him a list of warnings and instructions regarding his rights--including his rights to
remain silent, to hire an attorney, to have an attorney appointed, and to have an attorney present
during any questioning by law enforcement--and asked appellant if he understood those rights. 
Appellant further concedes that he indicated to the magistrate that he understood those rights. The
gravamen of appellant's complaint is that the magistrate immediately negated the prophylactic effect
of those warnings by informing appellant that he would not receive appointed counsel in Wharton
County, because such counsel would be appointed in Harris County. Appellant contends that the
magistrate affirmatively instructed him not to request an attorney in Wharton County. Appellant
asserts that the magistrate's alleged affirmative instruction misled him and removed his freedom to
invoke his right to counsel when Sgts. Chappell and Bush initially approached him and asked to
interview him about the murder. Appellant argues that, accordingly, the trial court should have
suppressed his entire Wharton County statement. 

 The Fifth Amendment precludes the government from compelling a criminal suspect to bear
witness against himself. U.S. Const. amend. V; Pecina, 361 S.W.3d at 74-75. In Miranda, the
Supreme Court created safeguards to protect the privilege against self-incrimination in the inherently
coercive atmosphere of custodial interrogations. Pecina, 361 S.W.3d at 75. In keeping with those
safeguards, police officers must give Miranda warnings to a person who is in custody before
questioning him. Id. Once an individual invokes his right to have counsel present during custodial
interrogation, a valid waiver of that right cannot be established by merely showing that the individual
responded to police-initiated interrogation after being advised of his rights again. Id. (citing
Edwards v. Arizona, 451 U.S. 477 (1981)). "Only if the person voluntarily and intelligently waives
his Miranda rights, including the right to have an attorney present during questioning, may his
statement be introduced into evidence against him at trial." Id.

 To evaluate whether appellant knowingly, intelligently, and voluntarily waived his Miranda
rights, we look to the standard articulated by the Supreme Court in Burbine. Joseph v. State, 309
S.W.3d 20, 25 (Tex. Crim. App. 2010). Initially, appellant's relinquishment of his right to have
counsel during interrogation must have been voluntary "in the sense that it was the product of a free
and deliberate choice rather than intimidation, coercion, or deception." Id. (quoting Burbine, 475
U.S. at 421). Appellant must have additionally waived the right to interrogation counsel "with full
awareness of both the nature of the right [he was abandoning] and the consequences of the decision
to abandon it." Id. "Only if the 'totality of the circumstances surrounding the interrogation' reveals
both an uncoerced choice and the requisite level of comprehension" may a court properly conclude
that a defendant knowingly, intelligently, and voluntarily waived his right to interrogation counsel. 
Id. But "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that
he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's
intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid
as a matter of law." Cobb v. State, 85 S.W.3d 258 n.7 (Tex. Crim. App. 2002) (quoting Burbine, 475
U.S. at 427). The totality-of-the-circumstances approach requires consideration of all the
circumstances surrounding the interrogation, including the defendant's experience, background, and
conduct. Id. (citing Fare v. Michael C., 442 U.S. 707, 725 (1979), and North Carolina v. Butler, 441
U.S. 369, 375-76 (1979)). "[A] defendant's conduct--namely, willingly talking with
investigators--can demonstrate a knowing, intelligent, and voluntary waiver of his Miranda rights." 
Id.

 We conclude that it was within the trial court's discretion to determine that appellant
voluntarily, knowingly, and intelligently waived his right to counsel before Sgts. Chappell and Bush
questioned him in Wharton County. Regarding appellant's allegation that the magistrate's statement
somehow misled him regarding his ability to invoke his right to counsel in Wharton County, we first
note the Supreme Court's unequivocal statement that "[w]hat matters for purposes of Miranda and
Edwards is what happens when the defendant is approached for interrogation, and (if he consents)
what happens during the interrogation--not what happened at any preliminary hearing." Montejo
v. Louisiana, 556 U.S. 778, 797 (2009); see Pecina, 361 S.W.3d at 78 ("Distilled to its essence,
Montejo means that a defendant's invocation of his right to counsel at his Article 15.17 hearing says
nothing about his possible invocation of his right to counsel during later police-initiated custodial
interrogation. The magistration event is not an interrogation event."). 

 We also reject appellant's characterization of the magistrate's statements regarding the
appointment of counsel in Wharton County. The record supports a finding that the magistrate simply
and accurately stated an administrative fact: should appellant request it, Harris County, rather than
Wharton County, would handle the appointment of counsel.

 Further, we do not think that the magistrate's statement placed appellant in an extraordinary
position. Following his magistration, appellant was essentially in the same situation as a defendant
who is arrested after a roadside stop and read his Miranda rights. The Fifth Amendment does not
require police to have, in tow, lawyers who are ready to be appointed at a moment's notice to assist
such defendants. See Davis v. United States, 512 U.S. 452, 460 (1994) ("In Miranda itself, we
expressly rejected the suggestion 'that each police station must have a "station house lawyer" present
at all times to advise prisoners,' and held instead that a suspect must be told of his right to have an
attorney present and that he may not be questioned after invoking his right to counsel.") (internal
citation omitted). "[T]he primary protection afforded suspects subject to custodial interrogation is
the Miranda warnings themselves. 'Full comprehension of the rights to remain silent and request
an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'" Id.
(quoting Burbine, 475 U.S. at 427). Nor does the Constitution require immediate magistration. See
County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991) (stating the general rule that jurisdictions
that provide judicial determinations of probable cause within forty-eight hours of arrest comply with
the Fourth Amendment). What is critical is the individual's immediate ability to invoke his Miranda
rights upon being placed in custody. The actual appointment of counsel--assuming that it occurs
within a constitutionally reasonable time after the invocation of this right--is of lesser importance.

 At the very most, this record supports a finding that there may have been some potential for
confusion on appellant's part regarding his ability to obtain appointed interrogation counsel in
Wharton County. But it was entirely within the zone of reasonable disagreement for the trial judge
to find, as it implicitly did, that appellant experienced no actual confusion. Defense counsel argued
that it was reasonable for appellant to interpret the magistrate's statement to mean that he could not
obtain appointed counsel in Wharton County. However, appellant did not present any evidence from
any source that he was actually confused by the magistrate's statements. The record is thus devoid
of evidence that he was actually confused by the magistrate's statements and that, but for them, he
would have invoked his right to counsel when Sgts. Chappell and Bush approached him. Cf.
Johnson v. State, 286 S.W.3d 346, 353 n.13 (Tex. Crim. App. 2009) ("Defense counsel's argument
to the [fact-finder] is not evidence.") (Keller, P.J., dissenting).

 After reviewing the videotaped statement, we conclude that the totality of the circumstances
surrounding the interrogation in Wharton County support the finding that appellant initially waived
his right to counsel with full awareness of the nature of the rights being abandoned and the
consequences of his decision to abandon them. Joseph, 309 S.W.3d at 27. Before Sgt. Chappell
began reading appellant his rights, appellant acknowledged that he had just been before the
magistrate. Appellant expressed no confusion regarding his right to counsel as explained by the
magistrate. As Sgt. Chappell read each right to him again, appellant once more indicated his
understanding, answering, "Yes, sir" and nodding his head up and down. The warnings that Sgt.
Chappell read to appellant at the beginning of the interview made appellant fully aware of his rights
under Miranda and Article 38.22, as well as the consequences of abandoning those rights.

 Immediately after reading warnings to appellant, Sgt. Chappell asked whether appellant
wanted to talk to the officers regarding the offense. Appellant did not ask for a lawyer. Instead, he
promptly responded, "Tell me what you know and I'll talk about it." When appellant later stated,
"It's not going to happen tonight," the officers did not resort to physical or psychological pressures
to elicit further statements. Rather, the videotape clearly shows that Sgt. Chappell began to leave
the interview room to retrieve appellant's shoes and get him water, as appellant had requested. When Sgt. Chappell began to leave the interview room, appellant stopped the detective and
spontaneously offered, "You're right about one thing." When Sgt. Chappell responded, "Pardon
me?" appellant repeated himself, stating, "You're right about one thing. It was not planned." When
Sgt. Chappell returned to the interview room with appellant's shoes and water, appellant directly
asked the officers, "What do y'all want to know? What do I need to tell you?" After Sgt. Chappell
answered that the officers needed to know "[w]hat happened," appellant did not invoke his right to
counsel, but instead discussed the offense. 

 Under the totality of the circumstances, it was within the zone of reasonable disagreement
for the trial court to admit the first part of appellant's Wharton County statement. Point of error one
is overruled.

 In point of error two, appellant alleges that Sgts. Chappell and Bush did not scrupulously
honor his right to silence after he said, "I don't want to talk anymore," in his Wharton County
statement. Appellant further asserts that the statement he gave to Officer Avila in Harris County was
the result of a conspiracy between Sgt. Chappell and Officer Avila to convince him to relinquish the
right to silence that he had previously invoked in Wharton County. For these reasons, appellant
argues, the factors set forth by the Supreme Court in Michigan v. Mosley, 423 U.S. 96 (1975),
required the trial court to suppress his Harris County statement to Officer Avila. 

 In Mosley, the Supreme Court "addressed the circumstances under which the prosecution is
prohibited from using a defendant's in-custody statement obtained by police who have renewed
interrogation after the defendant has invoked his right to remain silent." Murphy v. State, 766
S.W.2d 246, 248 (Tex. Crim. App. 1989). The Court rejected the defendant's argument that, once
the person has invoked his right to silence, further questioning of an individual in custody
represented a per se violation of the protections set out in Miranda. Mosley, 423 U.S. at 102-03
("Clearly, [nothing] in the Miranda opinion can be sensibly read to create a per se proscription of
indefinite duration upon any further questioning by any police officer on any subject, once the person
in custody has indicated a desire to remain silent."). Rather, the Court concluded that, under
Miranda, "the admissibility of the statements obtained after the person in custody has decided to
remain silent depends on whether" law enforcement authorities "scrupulously honored" the person's
"right to cut off questioning." Id. at 104. The factors relevant to the Mosley analysis are (1) whether
the suspect was informed of his right to remain silent before the initial questioning; (2) whether the
suspect was informed of his right to remain silent before the subsequent questioning; (3) the length
of time between initial questioning and subsequent questioning; (4) whether the subsequent
questioning focused on a different crime; and (5) whether police scrupulously honored the suspect's
initial invocation of the right to remain silent. Maestas v. State, 987 S.W.2d 59, 62 (Tex. Crim. App.
1999). We have also emphasized that "whether a resumption of questioning is consistent with
'scrupulously honoring' the right to remain silent depends on the unique facts and circumstances of
each case." Id. at 63.

 We may quickly dispose of the first, second, and fourth Mosley factors. As appellant
concedes and the record reflects, he was advised of his right to remain silent before both his Wharton
and Harris County interviews. Thus, Mosley's first and second factors weigh in favor of a finding
that the officers scrupulously honored his right to silence. Because the questioning by Sgts. Chappell
and Bush in Wharton County and by Officer Avila in Harris County related to the same offense, we
find that the fourth Mosley factor weighs against a finding that law enforcement scrupulously
honored appellant's invocation of his right to silence.

 We now turn to Mosley's third factor: the length of time that passed between Sgts.
Chappell's and Bush's initial questioning of appellant in Wharton County and Officer's Avila's
subsequent request to interview appellant in Harris County. The trial court found that roughly three
hours passed between these two events. Appellant offered no contrary evidence at the suppression
hearing. We note that in Mosley itself, "an interval of more than two hours" passed between the
initial and subsequent questioning at issue. 423 U.S. at 104. Moreover, the Supreme Court
described this interval as "the passage of a significant period of time." Id. at 106. Because the
passage of almost three hours in appellant's case exceeds the "significant period of time" in Mosley,
the third Mosley factor weighs in favor of a finding that law enforcement "scrupulously honored"
appellant's right to cut off questioning.

 On appeal, appellant argues that we should discount this significant interval because he was
in the presence of HPD officers for the entirety of that period and thus "never removed from an
interrogation environment." We do not find appellant's argument persuasive. The trial court
expressly found that Sgts. Bush and Chappell "concluded their interview with [appellant] in Wharton
County at approximately 2:12 [a.m.]" and then drove him to the HPD homicide. This finding
implies that Sgts. Bush and Chappell engaged in no further questioning of appellant after departing
Wharton County for Harris County. The record supports this implicit finding, and accordingly, we 
defer to it. Romero, 800 S.W.2d at 543. Both Sgts. Bush and Chappell testified that, other than Sgt.
Bush responding to a few questions from appellant at the beginning of the ride to Harris County,
neither detective engaged appellant in further conversation, much less interrogation. Sgt. Chappell
further testified that appellant fell asleep in the back of the police vehicle during the trip to Harris
County. Officer Avila testified that, after transport to Harris County, he did not immediately attempt
to interrogate appellant. Rather, Officer Avila had a Crime Scene Unit officer photograph appellant,
collect his clothes, and test his hands for gunshot residue. (17) Appellant did not dispute the officers'
testimony. While appellant was certainly in custody during the three-hour interval, there is no
evidence that, during that time, he was subjected to "interrogation" within the meaning of Miranda. 
See Rhode Island v. Innis, 446 U.S. 291, 299 (1980) ("'Interrogation,' as conceptualized in the
Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody
itself."). We decline to find that an "interrogation environment" existed during those three hours
because there is no evidence that any law-enforcement officer actually tried to interrogate appellant
during that interval. See id.

 Concerning the fifth and final Mosley factor, i.e., whether police scrupulously honored the
suspect's initial invocation of the right to remain silent, appellant focuses on the trial court's finding
that Sgts. Chappell and Bush did not scrupulously honor appellant's Wharton County invocation. 
But the trial court's finding is not dispositive of appellant's second point of error, given the unique
facts and circumstances of this case. See Maestas, 987 S.W.2d at 63. The trial court also found that 
Officer Avila scrupulously honored appellant's invocation of the right to counsel by immediately
terminating the Harris County interview when appellant invoked that right. Rather than giving his
Harris County statement to Officer Avila because he failed to scrupulously honor appellant's
invocation of his Miranda rights, appellant gave his statement to Officer Avila despite the officer's
scrupulous honoring of appellant's Miranda rights. Officer Avila read appellant his Miranda rights
and then immediately terminated the interview when appellant invoked his right to counsel. 
Appellant then re-initiated discussion of his case with Officer Avila, who read him his rights again,
and appellant expressly waived them. Only then did Officer Avila interview appellant about the
offense and obtain the statement at issue. Point of error two is overruled.

 In point of error three, appellant alleges that the trial court erred in admitting his Harris
County statement because Officer Avila intentionally dishonored appellant's invocation of the right
to counsel. Citing Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality op.), appellant
focuses on one line of Officer Avila's hearing testimony: after terminating the first interview and
turning off the videotape, Officer Avila re-entered the interview room to inform appellant about
"what was going to happen to him." Appellant contends that, under Bradshaw, telling appellant
"what was going to happen to him" was tantamount to Officer Avila re-initiating custodial
interrogation after appellant had invoked his right to counsel. Invoking Innis, appellant further
asserts that Officer Avila's response to appellant's ensuing question--regarding whether appellant's
ten-year-old son would have to testify--was a statement that Officer Avila should have known
would elicit an incriminating response. Appellant's arguments have no merit.

 Initially, Bradshaw is inapposite. In that case, the Supreme Court "clarified the Edwards rule
and established a two-step procedure to determine whether a suspect has waived his previously
invoked right to counsel." Cross v. State, 144 S.W.3d 521, 526-27 (Tex. Crim. App. 2004)
(discussing Bradshaw's import). Bradshaw did not concern what words or actions by police officers
may rise to the level of "interrogation" within the meaning of Miranda. Rather, Innis squarely
addressed that issue and thus represents the applicable authority. 

 But appellant's reliance on Innis is likewise unavailing. In Innis, police officers arrested the
defendant in connection with the death, by shotgun blast, of a taxicab driver. 446 U.S. at 293-94. 
After officers read Innis his Miranda rights, he invoked his right to counsel. Id. at 294. The officers
did not thereafter attempt to question Innis. Id. at 294-95. But while they were transporting him
from the arrest site to the police station, two officers engaged each other in a conversation within
Innis's hearing. Id. During that conversation, the officers discussed the missing shotgun, noting the
presence in the neighborhood of a school for handicapped children and expressing their concerns
over what might happen if any of the children discovered the weapon. Id. Innis interrupted the
conversation, telling the officers to turn the car around so that he could show them the location of
the missing shotgun. Id. at 295. The officers drove Innis back to the scene of his arrest. Id. After
receiving an additional set of Miranda warnings, Innis stated that he understood those rights but
"wanted to get the gun out of the way because of the" school children. Id. Innis then led officers
to the hidden shotgun. Id. The trial court denied Innis's subsequent motion to suppress the shotgun
and his statements to police regarding it. Id. at 295-96. But the state supreme court set aside Innis's
conviction on the grounds that the officers had subjected him to "'subtle coercion' that was the
equivalent of 'interrogation'" under Miranda. Id. at 296-97.

 The Supreme Court disagreed. It first clarified that "interrogation" for Miranda purposes
means express questioning or "its functional equivalent": "[A]ny words or actions on the part of the
police (other than those normally attendant to arrest and custody) that the police should know are
reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 300-01 (internal
footnote omitted). But the Court also noted that police "surely cannot be held accountable for the
unforeseeable results of their words or actions." Id. at 302-03. Considering the facts of Innis's case,
the Court rejected the notion that the police officers, through their conversation in Innis's hearing,
had subjected him to the functional equivalent of interrogation under Miranda. Id. at 302. The
conversation between the officers was brief, as opposed to a "lengthy harangue"; their comments
were not particularly "evocative"; and there was nothing in the record to suggest that the officers
were aware that Innis was particularly susceptible to an appeal to his conscience concerning the
safety of handicapped children. Id. at 302-03. In short, the Court concluded, it "[could not] say that
the officers should have known that it was reasonably likely that Innis would so respond." Id. at 303.

 Turning to the record before us, we discern no conduct by Officer Avila that approaches even
the level of "subtle coercion" that the Supreme Court, in Innis, found not to represent interrogation
for Miranda purposes. His uncontradicted testimony was that he re-entered the interview room after
terminating the interview and leaving the room to turn off the videotape and that his general purpose
was "to inform [appellant] of the process, what was going to happen to him." When asked
specifically what he said to appellant, Officer Avila testified, "I told him that I was going to call for
a marked unit to come and pick him up and take him to the city jail while--so we could contact the
district attorney and run the case." Officer Avila agreed that by "run the case," he meant "get the
charge filed." Officer Avila's brief statement to appellant was not one that could reasonably be
expected to elicit an incriminating response. To the extent Officer Avila mentioned that appellant
would be transported to the jail, his Avila's statement is akin to a question normally attendant to
arrest and custody, which is excluded from the self-incrimination privilege that the Fifth Amendment
protects. See Jones, 795 S.W.2d at 175. To the extent Officer Avila referred to the fact that the
police would pursue charges against appellant, we cannot conclude that he could have reasonably
expected the statement to elicit an incriminating response. See United States v. Collins, 683 F.3d
697, 703 (6th Cir. 2012) ("An accurate statement made by an officer to an individual in custody
concerning the nature of the charges to be brought against the individual cannot reasonably be
expected to elicit an incriminating response."); United States v. Payne, 954 F.2d 199, 202 (4th Cir.
1992) ("[T]he Innis definition of interrogation is not so broad as to capture within Miranda's reach
all declaratory statements by police concerning the nature of the charges against the suspect and the
evidence relating to those charges."); Plazinich v. Lynaugh, 843 F.2d 836, 839 (5th Cir. 1988) ("It
is difficult to conceive . . . that the informational comment made to a defendant can be so
'overrreaching' as to violate the spirit of Edwards."). We conclude that Officer Avila did not initiate
an interrogation within the meaning of Miranda by making this statement.

 Officer Avila testified that, after he told appellant about his pending transport to the city jail
and that he would present the case to the district attorney, appellant asked whether his "10-year-old
son was going to have to go to court and testify." Officer Avila responded that "there was a
possibility that [appellant's son] might have to do that." Appellant then "said that he had changed
his mind and he wanted to give a statement." Officer Avila, whom the trial court found to be a
credible witness, asserted that this exchange represented the entirety of the conversation that he had
with appellant before restarting the videotape. We decline to "propound a rule that police officers
may not answer direct questions even in the most cursory and responsive manner." United States
v. Taylor, 985 F.2d 3, 8 (1st Cir. 1993). 

 Further, although Sgt. Chappell testified that, during the interview in Wharton County,
appellant showed some concern over the prospect of his son having to testify at trial, he also testified
that he did not tell Officer Avila anything regarding appellant's concern. (18) Sgt. Chappell also stated
that he and Officer Avila did not, at any time, watch appellant's videotaped Wharton County
statement together. Officer Avila testified that, before interviewing appellant in Harris County, he
had only Sgts. Chappell's and Bush's brief synopsis of their Wharton County interview with
appellant. He did not recall that the synopsis included information about appellant showing concern
over his son having to testify. Officer Avila testified that he learned that information only after
taking appellant's Harris County statement. Appellant offered no contrary evidence at the
suppression hearing. We cannot conclude that Officer Avila could have reasonably expected the
statement to elicit an incriminating response. Point of error three is overruled. 

 In point of error four, appellant argues that the trial court reversibly erred in admitting any
of appellant's Wharton and Harris County statements at trial because the magistrate judge violated
Article 15.17. Specifically, appellant contends that the magistrate violated Article 15.17 because she
did not cause the magistration to be recorded and because she "told [appellant that] appointed
counsel would not be provided." 

 Concerning the failure to record the magistration, the state argues that appellant failed to
argue at trial that his statements were inadmissible on this basis, and therefore failed to preserve the
issue for appeal. We have reviewed the record, which reflects that appellant did not raise the failure-to-record argument in either his written motion to suppress or in his arguments at the hearing on the
motion to suppress. While we agree that appellant failed to preserve this argument for our review,
Tex. R. App. P. 33.1(a), in the interest of completeness, we will address appellant's claim.

 The allegation that the magistrate "told [appellant that] appointed counsel would not be
provided" lacks merit. As we discussed in point of error one, we reject appellant's characterization
of the magistrate's statements regarding the appointment of counsel in Wharton County. The record
supports a finding that the magistrate simply and accurately stated an administrative fact: that Harris
County, rather than Wharton County, would handle the appointment of counsel, should appellant
request it. 

 Further, even assuming for purposes of argument that the magistrate's statement could be
considered error under Article 15.17, it was cured when appellant received the requisite
admonishments regarding the provision of counsel from Sgt. Chappell before being interviewed in
Wharton County. Alternatively, the error was harmless, as it did not affect appellant's substantial
rights. See Tex. R. App. P. 44.2 (b). Point of error four is overruled.

Admission of Autopsy Photograph In point of error five, appellant contends that the trial court erred when, over appellant's Rule
403 objection, it admitted State's Exhibit 158 into evidence at the guilt-innocence phase during Dr.
Albert Chu's testimony. See Tex. R. Evid. 403. Dr. Chu, an assistant medical examiner at the
Harris County Institute of Forensic Sciences, testified that he performed Desirae's autopsy and that
the photograph represented by State's Exhibit 158 depicted an incision he made to the left side of
Desirae's back during the procedure. Dr. Chu told the jury that he made the incision to retrieve a
bullet that had entered Desirae's body from the front, penetrated her sternum, hit her heart and left
lung, and lodged in the tissue on the left side of her back. Dr. Chu further testified that he submitted
the bullet he recovered from the incision to the firearms laboratory for comparison to any weapon
recovered in the case. On appeal, appellant complains that the photograph was "repetitious and
gruesome." 

 Rule 403 requires that a photograph possess some probative value and that its inflammatory
nature does not substantially outweigh that probative value. Williams v. State, 301 S.W.3d 675, 690
(Tex. Crim. App. 2009); Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). In ruling on
a Rule 403 objection, the trial court must "consider the inherent tendency that the evidence may have
to encourage resolution of material issues on an inappropriate emotional basis." Narvaiz v. State,
840 S.W.2d 415, 429 (Tex. Crim. App. 1992) (internal quotations and alterations omitted). The trial
court must then balance that inherent tendency, if any, against "the host of factors affecting
probativeness, including the relative weight of the evidence and the degree to which its proponent
might be disadvantaged without it." Id. Rule 403 favors the admission of relevant evidence and
presumes that relevant evidence will be more probative than prejudicial. Rayford v. State, 125
S.W.3d 521, 529 (Tex. Crim. App. 2003); Hayes v. State, 85 S.W.3d 809, 815 (Tex. Crim. App.
2002). 

 In determining whether the danger of unfair prejudice substantially outweighs a photograph's
probative value, a court may consider many factors. Williams, 301 S.W.3d at 690. These include: 
the number of such photographs the proponent offers; their gruesomeness; their level of detail; their
size; whether they are in color or black-and-white; whether they are close-ups; whether they depict
a clothed versus a naked body; the availability of other means of proof; and other circumstances
unique to the individual case. Id. "It is also relevant for the trial court to consider whether the body
as photographed has been altered since the crime in some way (e.g., by autopsy) that might enhance
its gruesomeness to the defendant's detriment." Narvaiz, 840 S.W.2d at 429. Autopsy photographs
are generally admissible unless they do not aid the fact finder in determining the injuries alleged to
have been inflicted by the defendant, but rather emphasize solely mutilation of the victim caused by
the autopsy itself. See Williams, 301 S.W.3d at 690. Further, "changes rendered by the autopsy
process are of minor significance if the disturbing nature of the photograph is primarily due to the
injuries caused by the appellant." Hayes, 85 S.W. 3d at 816. We review for an abuse of discretion
a trial court's decision to admit photographs over an objection. Williams, 301 S.W.3d at 690.

 During Dr. Chu's testimony, the state moved to admit a total of six photographs taken at
Desirae's autopsy, including State's Exhibit 158. Appellant objected to State's Exhibit 158 under
Rule 403, on the grounds that the photograph was "overly grotesque." The state countered that the
photograph represented by State Exhibit 158 was the only one that showed the recovery of that
particular bullet from Desirae's body and that the bullet was sent to the firearms laboratory and
ultimately matched to the pistol found in appellant's vehicle. After reviewing the other photographs
from Desirae's autopsy, the trial court overruled appellant's objection, stating that the court found
the exhibit relevant and that its probative value substantially outweighed its potential for unfair
prejudice.

 The photograph in question is in color, measures roughly eight-and-a-half by eleven inches,
and is not a close-up view. Moreover, it is only one of a small number of photographs of Desirae's
autopsy shown to the jury and the only one portraying this specific view. Although Desirae's body
is shown unclothed and a small portion of her buttocks is visible at the bottom of the frame, that is
not the focus of the photograph, which is overwhelmingly clinical in nature. Dr. Chu's neat surgical
incision appears slightly above the middle of the photograph. Although the record does not reveal
the scale of the photo, the incision appears to be no more than a few inches long. Dr. Chu's gloved
fingers are visible, using forceps to retract the skin to more clearly reveal a bullet lodged in the
exposed tissue. Although pink and darker red tissue are visible within the incision site, as is a bullet
slug, the wound is not bloody. Contrary to appellant's characterization, the incision with the skin
pulled away slightly is not especially gruesome. To the extent that the photograph is disturbing, it
is because of the injury that appellant inflicted on Desirae by shooting her. The alteration to her
body caused by the autopsy, in an effort to retrieve the fatal bullet, pales in significance. See Hayes,
85 S.W.3d at 816. 

 The trial court was well within its discretion to find that the photograph's probative value
substantially outweighed its potential for unfair prejudice. Point of error five is overruled.

Cross-examination of Punishment-phase Defense Witness

 In points of error six through eight, appellant challenges the trial court's ruling that allowed
the state to cross-examine defense witness Frank Aubuchon regarding a statistical report generated
by TDCJ's Emergency Action Center (EAC). Specifically, in points of error six and seven, appellant
argues that the trial court should have sustained his objections to the state's line of questioning as
irrelevant and unfairly prejudicial under Rule 403. In point of error eight, appellant contends that,
by allowing the state to question Aubuchon regarding the report, the trial court violated his Eighth
Amendment right to an individualized sentencing determination. See Woodson v. North Carolina,
428 U.S. 280, 304 (1976) (plurality op.). 

 Aubuchon testified on direct examination that he had worked for TDCJ in inmate
classification, at the unit level, for many years. At the time of trial, he made a living testifying in
court concerning TDCJ's prisoner-classification procedures and security measures. Aubuchon
testified that there were then 111 TDCJ units, with a maximum capacity of approximately 160,000
offenders. He told the jury that TDCJ facilities are divided into five different security levels, with
level five (i.e., maximum security) units being the most secure and level one ("trustee camps") being
the least secure. Within those maximum-security units, Aubuchon explained, there are two
populations of inmates: those in "general population" and those in administrative segregation, a
more restrictive custody environment. Inmates in general population are assigned custody
classifications on a scale that runs from G-1 to G-5, with G-5 being the most restrictive custody class
outside of placement in administrative segregation. 

 Aubuchon testified that, if sentenced to life without the possibility of parole, appellant would
be assigned to one of the eighteen maximum-security units within the TDCJ system, which he
described as being large facilities housing approximately 2,000 inmates each. Aubochon described
in detail the construction and security measures in place at such facilities. He asserted that all
movement within the maximum-security units is well contained and controlled. Although inmates
are not always individually escorted within the units, all inmates are always within sight, sound, or
camera view of correctional staff. Aubuchon further testified that, assuming that appellant was
assigned to general population, he could never achieve a less-restrictive custody classification than
G-3, which Aubuchon characterized as "very restrictive." For example, Aubochon asserted that, as
a G-3 inmate, appellant would be limited to working in the kitchens and laundry because he could
not be assigned to jobs providing him access to vehicles, tools, or loading docks or to jobs involving
contact with non-uniformed female employees such as doctors, nurses, or teachers. Aubuchon also
asserted that prison staff make virtually all decisions regarding where an inmate may go within the
unit and when. When an inmate is not assigned to be at work, he may choose to spend time in the
recreation area, day room, or his cell, according to the schedule for his particular cell block. 
Aubuchon also told the jury that TDCJ was in the process of installing closed-circuit television
monitors throughout its facilities so that there would be no place where an inmate could be without
being subject to remote monitoring and recording. At the conclusion of direct examination, defense
counsel engaged Aubuchon in the following colloquy:

 Q. Is TDCJ a perfect prison system?

 A. No, sir.

 Q. Is there any perfect prison system that you know of?

 A. No, sir.

 Q. Based on the time that you worked and what you know about the prison
system, is it a pretty good one?

 A. Tremendous strides have been made in the last 30 years from going to convict
guards to where we are now.

 Q. Is it a fairly secure place?

 A. I believe so.


 On cross-examination, the state probed Aubuchon's testimony concerning the restrictions
attendant upon G-3 classified inmates. The state elicited testimony supporting a reasonable inference
that, even as a G-3 classified inmate, appellant would have opportunities and the means by which
to commit violent acts. The state then focused on Aubuchon's testimony that, although not a perfect
system, TDCJ was "a fairly secure place": "[Defense counsel] asked you whether [TDCJ] was
perfect and you said no, but you feel like it's fairly safe, right?" Aubuchon responded, "Yes,
ma'am," agreeing with or adopting the prosecutor's interpretation of his earlier testimony. (19)
 At this
point, the prosecutor began to inquire into Aubuchon's familiarity with the statistical prison-crime
reports generated by EAC, specifically those generated for the current year. 

 The inquiry prompted a bench conference at which defense counsel objected to the state
being allowed to question Aubuchon regarding the specific number of various offenses listed in the
report. The defense argued that appellant "should be sentenced based upon his conduct and not the
conduct of other prisoners" and that to allow questioning about the specific number of offenses was
unfairly prejudicial under Rule 403. 

 The trial court "agreed . . . 100 percent . . . that the jury [was] to consider [appellant] and his
conduct and not the conduct of others." But, it elaborated:

 I think that there has been an effort by the defense, and certainly understandable, to
educate the jury on where [appellant] would be housed, what kind of security levels
it might [entail], and things he's allowed to do, and essentially suggested through this
witness that--based on the answer to the last question that it's a fairly safe place[.]
I think if the State is in possession of information that calls that opinion to be
questioned or at least [gives] the jury some other information to consider in
evaluating that answer, I think that the rules allow that.


After entertaining additional argument, the trial court overruled the defense's objection, finding that
the state's line of cross-examination regarding the EAC statistics was relevant and that its probative
value was not outweighed by any unfair prejudice. It granted appellant a running objection.

 The state continued its cross-examination regarding the EAC statistics. It elicited testimony
that in the month of August 2011, TDCJ recorded 1760 serious (20) or "unusual" incidents within its
system. Although there were no escapes or attempted escapes reported, there had been 108
possessions of weapons; twenty-four alleged sexual assaults; three serious staff assaults; 127 serious
offender assaults; and forty-one "chunkings." (21) It elicited testimony that, year-to-date, TDCJ had
recorded 12,550 serious or unusual incidents: 731 weapons possessions; 239 alleged sexual assaults;
fifty-eight serious staff assaults; 864 serious offender assaults; and 278 chunkings. Aubuchon agreed
that despite the measures TDCJ had taken or might take, incidents still occurred and would continue
to occur. The state then left the subject of the EAC report and resumed questioning Aubuchon about
the restrictions on G-3 classified inmates and the opportunities and means those inmates have to
commit violent acts, despite those restrictions.

 On redirect, the defense attempted to counter Aubuchon's cross-examination testimony
regarding the EAC reports. In response to defense questioning, Aubuchon testified that the EAC
statistics did not surprise him because there have always been some serious incidents occurring
within the penitentiary. Aubuchon opined that, if anything, the ratio of serious incidents to inmates
reflected in the report was surprisingly low given that 56% of inmates are in TDCJ for violent, "3g"
offenses. (22) Aubuchon further noted that the EAC statistics reflect only the total number of incidents,
without regard to whether the same inmate may be responsible for multiple incidents. Aubuchon
acknowledged that even an inmate in administrative segregation could engage in criminal conduct. 
But he also noted that appellant, who had been housed in administrative segregation while in the
Harris County jail, had no record of committing assaultive conduct during his detention. 

 On recross-examination, the state elicited testimony that, despite what Aubuchon
characterized as a low ratio of violence to the total number of inmates, three homicides had occurred
within TDCJ in the current year to date. Aubuchon also acknowledged that, given his experience
and the number of violent offenders in TDCJ, it would not have surprised him for the number of
serious incidents to be higher. Aubuchon further acknowledged that he could not know whether
appellant would engage in assaultive behavior in TDCJ. On re-redirect examination, Aubuchon
opined that TDCJ's security controls worked and were responsible for the "low" incidence of
violence relative to the number of inmates.

 Although appellant contends that the state's line of questioning was not relevant under Rule
403, we perceive no error in the trial court's contrary conclusion. Rule 403 requires that the
evidence at issue be both relevant and not unfairly prejudicial. See Tex. R. Evid. 403. "Relevant
evidence" is "evidence having any tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable than it would be without the
evidence." Tex. R. Evid. 401. At the punishment phase of appellant's capital-murder trial, the court
tasked the jury with determining, inter alia, whether there was a probability that appellant would
commit criminal acts of violence that would constitute a continuing threat to society. See Art.
37.071, § 3(b)(1). It is well established in our case law that "society" includes both prison and free
world. Lucio v. State, 351 S.W.3d 878, 903 (Tex. Crim. App. 2011). Evidence regarding whether
the prison environment offers opportunities for violence was relevant to the jury's future-dangerousness determination, as was evidence concerning the efficacy of TDCJ's measures to
control such opportunities. Here, such evidence was introduced by defense counsel. The state was
therefore entitled to probe Aubuchon's definition of "fairly secure." Point of error six is overruled.

 In point of error seven, appellant asserts that the state's line of questioning regarding the EAC
report was unfairly prejudicial under Rule 403. In point of error eight, he contends that such
questioning denied him the individualized sentencing determination guaranteed by the Eighth
Amendment. Appellant's arguments have no merit. The trial court did not permit the state to
question Aubuchon regarding specific incidents of conduct by other inmates, nor did it allow the
state to suggest that appellant was responsible for any of the incidents reflected in the EAC report. 
Cf. Ex parte Lane, 303 S.W.3d 702, 712 (Tex. Crim. App. 2009) (criticizing the prosecution for
attempting to persuade the jury to convict the applicant based on an uncharged offense for which he
was not on trial). Rather, the court limited the state to questioning Aubuchon about raw data
concerning broad categories of offenses committed inside TDCJ and the frequency with which they
occurred, in response to Aubuchon's assertion that TDCJ was a fairly secure or safe place. This was
neither unfairly prejudicial under Rule 403 nor a denial of an individualized sentencing
determination as guaranteed by the Eighth Amendment. Points of error seven and eight are
overruled.

Denial of Mistrial

 In point of error nine, appellant argues that the trial court reversibly erred at the punishment
phase when it denied his motion for a mistrial. Appellant asserts that a mistrial was warranted
because the state "fabricated a death threat by misstating the evidence during [its] closing" argument. 
The mistrial motion arose from the final sentence of the following portion of the prosecution's
argument:

 Ladies and gentlemen, on February 3rd, 2010, [appellant] walked out of Ms.
Boyd's office and drove to Bass Pro Shop. His [therapy] appointment ended at 1:45. 
And at 1:40 p.m. [sic] on February 3rd, 2010--the receipt is there, look at it--at 2:40
p.m., he was standing at the register [of Bass Pro Shop] with this (indicating). (23) And
not just this, but a box of hollow-point ammunition. One hour after he walked out
of Therapist Boyd's office.

 

 We don't know what happened that night. We know the kids were there
visiting. Did he sit around and think about what he was going to do? Because if you
don't know by now that it was in his mind to do [it] the day before, I don't know
what else we can show or tell you. Everything tells you that he did this and he knew
he was going to do it. And if you don't know just from these facts, you can look at
his character and his past and know.

 

 He took this gun and he went home. And the next day, after enjoying, I
guess, an evening with his sons, he took them home to their mother. And on the way,
he stopped at Chili's. And at Chili's, he told Piero: If something happens to your
mother and I--if your mother ends up dead in other words, and I go to prison--


 Defense counsel interjected: "Objection. Improper argument, Judge. Not supported by the
facts." The trial judge sustained the objection, telling the prosecutor to "[s]tay in the record." 
Defense counsel moved the trial court to instruct the jury to disregard. The trial judge granted the
request, directing the jury to "disregard the last statement of the prosecutor." Defense counsel then
moved for a mistrial, but the trial court denied the motion. The prosecutor continued, without
objection from defense counsel:

 Well, let me quote it. [Appellant] said: If something happens to your mother and I,
to his 10-year-old son, you are to go live with your Aunt Carina. And he said that
less than two hours from when he stood on [Melissa's] doorstep and killed her.


 I'm sorry, ladies and gentlemen, but what do you think that is? What do you
think that is?

 Appellant contends that the statement at issue was solely an "[explanation] to one's child that
he would be cared for if anything happened to his parents." He asserts that the state attempted to
turn the statement into a "death threat" against Melissa, when that argument did not represent a
reasonable inference from the evidence. Therefore, appellant contends, the prosecutor's argument
was improper. Appellant further alleges that the trial court's instruction for the jury to disregard the
statement was inadequate to cure the damage to his substantial rights, and thus, a mistrial was in
order. 

 We have repeatedly stated that, even when the prosecution mentions facts outside the record
during argument, an instruction to disregard will generally cure the error. See, e.g., Freeman v. State,
340 S.W.3d 717, 727-28 (Tex. Crim. App. 2011); Gamboa v. State, 296 S.W.3d 574, 580 n.12 (Tex.
Crim. App. 2009). Here, Piero Cole's actual testimony was that, shortly before the shootings,
appellant said to him: "If me [sic] or your mom dies, you would go live with your Aunt Corina." 
The prosecutor's argument--which interpreted appellant's words in the context of evidence
suggesting that his actions were premeditated--represented a reasonable inference from the
evidence. But even assuming that the state's argument was improper, it was "not so extreme as to
render ineffective an instruction to disregard." Martinez v. State, 17 S.W.3d 677, 691 (Tex. Crim.
App. 2000). Point of error nine is overruled.

Constitutionality of Article 37.071, Section 2(b)(1)

 In points of error eleven and twelve, appellant argues that Article 37.071, § 2(b)(1), is
unconstitutional on its face and as applied to him because the future-dangerousness special issue
lowers the state's burden of proof to a probability. Specifically, appellant alleges that Article 37.071,
§ 2(b)(1), violates the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution
and Article I, §§ 3, 10, 13, and 19 of the Texas Constitution. As appellant acknowledges, we have
repeatedly overruled such challenges to Article 37.071, § 2(b)(1). See, e.g., Rayford v. State, 125
S.W.3d 521, 534 (Tex. Crim. App. 2003); Robison v. State, 888 S.W.2d 473, 481 (Tex. Crim. App.
1994). Appellant does not persuade us to revisit these issues. Points of error eleven and twelve are
overruled.

Limitation of Appellant's Closing Argument

 In point of error thirteen, appellant alleges that the trial court impermissibly "limited [his]
presentation of mitigating evidence during closing argument" when it sustained the state's objections
to certain aspects of his punishment-phase argument. Appellant contends that the trial court violated
the Eighth Amendment because it "limited the mitigation evidence appellant was able to present and
limited the evidence the jury believed [it] could consider."

 Appellant's argument has no merit. The parties did not embark on closing argument until
the evidentiary portion of the punishment trial was complete. There was no evidence to introduce
or "present" during closing argument. See Johnson, 286 S.W.3d at 353 n.13 (counsel's arguments
to the fact finder are not evidence). The trial court's rulings at issue could not have limited
appellant's presentation of mitigating evidence, which was already complete before closing argument
even began. 

 Further, the jury charge clearly instructed the jury that it must consider "all the evidence"
submitted to it during the entire trial in answering the special issues. We presume that juries follow
the trial court's instructions. See Casanova v. State, 383 S.W.3d 530, 543 (Tex. Crim. App. 2012)
(usual presumption on appeal is that jurors follow trial court's explicit instructions to the letter). 
Appellant contends that, by sustaining the state's objections and instructing the jury to disregard
defense counsel's arguments, the trial court somehow caused the jury to believe that it could not
consider certain evidence for purposes of answering the mitigation special issue. But his argument
is speculative and inadequate to overcome the presumption that the jury followed the trial court's
express instructions to consider all of the evidence in answering the special issues. See id. Point of
error thirteen is overruled.

 In point of error fourteen, appellant alleges that, by sustaining the state's objections to his
closing argument, the trial court denied him his right to counsel. "Although we have held that
improper denial of a jury argument may constitute a denial of the right to counsel, this holding
assumes that the jury argument is one the defendant is entitled to make." Davis v. State, 329 S.W.3d
798, 825 (Tex. Crim. App. 2010); see McGee v. State, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989). 
Proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2)
reasonable deduction from the evidence; (3) answer to the argument of opposing counsel; or (4) plea
for law enforcement. Freeman, 340 S.W.3d at 727. 

 The first sustained objection of which appellant complains arose when defense counsel noted
the emotion that appellant's biological mother, Sonya, and younger sister, Corina, showed when they
testified. Earlier in his closing argument, defense counsel had discussed the circumstances of
appellant's adoption by the Coles. Counsel had emphasized Sonya's reluctance to part with her son
and the emotional pain that appellant and his biological family had experienced as a result of the
separation. After discussing other topics, defense counsel returned to the subject of appellant's
adoption, reemphasizing the emotional pain it caused and commenting on the love that appellant's
biological family had for him: 

 You could see when [Corina] and her mother, Sonya, testified [about] the impact that
that whole situation back from 1978 [when the Coles adopted appellant] had upon
the family. You know--because I saw y'all see it--that finally you saw some
emotion in [appellant] when his sister showed her emotion about him.


(Emphasis added). The state objected after defense counsel uttered the italicized portion of the
statement, on the grounds that the statement was outside the record. At the state's request, after
sustaining the objection, the trial court instructed the jury to "disregard the last statement." On
appeal, appellant contends that defense counsel was arguing that appellant felt remorse for killing
the two victims and that remorse for the crime is relevant to the mitigation special issue. He asserts
that, by sustaining the objection, the trial court thwarted defense counsel's attempt to draw the jury's
attention to mitigating evidence and thus denied appellant his right to counsel.

 We perceive no error in the trial court's decision to sustain the state's objection. Initially,
the record does not support appellant's assertion concerning the purpose of defense counsel's
argument--that it was an attempt to persuade the jury that appellant felt remorse for killing the two
victims. It is clear from the preceding sentence--"You could see when [Corina] and her mother,
Sonya, testified [about] the impact that that whole situation back from 1978 had upon the
family"--that counsel was returning to the subject of appellant's adoption, in a renewed attempt to
emphasize the emotional pain that the separation caused appellant and his biological family. It was
not an attempt by defense counsel to argue that appellant had shown remorse for the killings. The
trial court could not have deprived defense counsel of an argument that counsel was not attempting
to make.

 Moreover, defense counsel's statement during closing argument was neither a plea for law
enforcement nor was it an answer to the state's argument. Further, defense counsel's statement
cannot reasonably be deemed a summary of the evidence or a reasonable deduction from the
evidence because "[t]his sort of argument constitutes no evidence at all." Cf. Good v. State, 723
S.W.2d 734, 736 (Tex. Crim. App. 1986). Appellant's demeanor during his sister's testimony was
not evidence subject to reference or allusion by defense counsel. In Good, over objection, the trial
court permitted the prosecutor to argue to the jury that the defendant's orderly demeanor during the
complainant's testimony was probative, inter alia, of the defendant's lack of remorse for the offense. 
Id. at 735. In reversing the conviction, we explained that the defendant's nontestimonial demeanor
"was not evidence subject to reference by the prosecutor" because "[i]t was not offered into evidence
through any legally recognizable method of proof. Allowing the state to summarize [the
defendant's] non-testimonial demeanor impermissibly placed [the defendant's] demeanor before the
jury through the prosecutor's unsworn jury argument. This sort of argument constitutes no evidence
at all." Id. at 736 (internal citation omitted). 

 We see no reason that this conclusion should not apply equally when the defense attempts
to argue that a defendant's demeanor during the testimony of another witness is probative of the
defendant's remorse for the offense--especially where, as here, the defendant does not elect to
testify. A contrary rule would allow defendants, through their counsel's jury argument of their
counsel, to use the right to silence as both a shield and a sword, which we do not permit. See United
States v. Hastings, 461 U.S. 499, 515 (1983) (Stevens, J., concurring) (protective shield of the Fifth
Amendment should not be converted into a sword); Wehling v. Columbia Broadcasting System, 608
F.2d 1084, 1087 (5th Cir. 1979) ("The plaintiff who retreats under the cloak of the Fifth Amendment
cannot hope to gain an unequal advantage against the party he has chosen to sue. To hold otherwise
would, in terms of the customary metaphor, enable plaintiff to use his Fifth Amendment shield as
a sword. This he cannot do."); Texas Dep't of Pub. Safety Officers Ass'n v. Denton, 897 S.W.2d
757, 760-61 (Tex. 1995) (regarding the Fifth Amendment privilege, plaintiff cannot eat his cake and
have it, too).

 After the trial court sustained the state's objection to defense counsel's statement about 
appellant's demeanor during Corina's testimony, counsel returned to the subject of the testimony
given by Sonya. Counsel argued that Sonya's testimony showed how important appellant was to his
Ecuadoran family. Counsel then acknowledged that, despite how deeply appellant may have affected
his Ecuadoran family, his actions on the day of the offense had also deeply affected "a lot of people." 
Counsel asserted, "Nobody here is minimizing that, but I ask you to ask yourselves this question: 
What impact does the death penalty have upon [appellant's] boys?" The state objected to the
question posed by defense counsel on the grounds that it constituted an improper argument. The trial
court sustained the objection. 

 Relying on Ayers v. Belmontes, 549 U.S. 7, 10 (2006), appellant argues that defense counsel's
question attempted to draw the jury's attention to "forward-looking mitigation evidence," i.e.,
appellant's "potential to continue to be a positive influence in [his sons'] lives." We reject this
contention. Defense counsel's question expressly asked the jury to focus on the impact appellant's
execution would have on his sons, rather than evidence that appellant was committed to being a good
father to his sons in the future. (24) The trial court's decision to disallow such argument was within the
zone of reasonable disagreement. Cf. Williams v. State, 270 S.W.3d 112, 139 (Tex. Crim. App.
2008) (trial court does not abuse its discretion by excluding execution-impact testimony).

 Appellant next complains that the trial court improperly sustained the state's objection at the
end of the following portion of defense counsel's closing argument:

 I don't think I ever mentioned that when [appellant] left the scene in that truck he had
OnStar. And don't you know that he knew he had OnStar? And don't you know that
he knew he would be found and caught? And he had his son with him. After the
worst 15 to 30 seconds in his entire life, he turned around because little Lucas was
saying: Daddy, Daddy, and he turned around and picked him up. And that can be
mitigating. Okay? There was no Amber Alert, there was no kidnapping. He just
wanted to be with his son a few more minutes before he was caught. And I guarantee
you he absolutely knew he was going to be caught. And now here he is.

(Emphasis added.) The state objected on the grounds that "all of that" was "outside the record." 
Appellant argues that the italicized portion of the above-quoted passage nonetheless constituted a
reasonable inference from the evidence. We are not persuaded that the trial court's ruling fell
outside the zone of reasonable disagreement. 

 An attorney may make reasonable deductions from the evidence so long as the argument is
supported by the evidence and offered in good faith. Andujo v. State, 755 S.W.2d 138,144 (Tex.
Crim. App. 1988). Defense counsel's statement concerned appellant's internal thought processes,
something to which only appellant would normally be privy unless he told someone else. But
appellant did not testify at either phase of the trial to offer the jury an explanation for taking the
toddler with him. To the extent appellant alluded to Lucas in the videotaped statements he gave to
police, it was not an abuse of discretion for the trial court to conclude that defense counsel's
inference was unreasonable. In the portion of his Wharton County statement that was admitted into
evidence, appellant mentions Lucas once, near the end of the statement, asking for Lucas's present
location. In his Harris County statement, appellant describes Lucas approaching him in the parking
lot immediately after the shooting and relates that he picked up the child and put him in the truck. 
Later, appellant states that, when he took the money from his employer, he was thinking that he
wanted to find a place for Lucas, did not want anything to happen to the child, and wanted to leave
Lucas with someone, but no one was around. From this evidence, it is not a reasonable deduction
that appellant wished to keep the child with him for just a little while longer. 

 We next consider appellant's challenge to the trial court's ruling regarding the following
defense argument:

 [I] want to tell you what a wonderful experience it's been to represent
[appellant] because obviously [co-counsel] and I . . . have spent hours and hours with
[appellant]. And I think that I have learned is [sic] I recognize what all the other
people recognize in [appellant] in the time that they knew him.

 Now, maybe I have not known him for five years, maybe I didn't work with
him on a daily basis, but I'm pretty darn familiar with him since [the] middle of
February of 2010. And I see why grown men, coworkers--

 The state objected that defense counsel's argument was outside the record. The trial court
did not rule on the objection, instead stating only, "No personal opinion, [counsel]." Appellant
contends that defense counsel has the same right as the prosecutor to argue his opinion if that opinion
is based on the evidence. See Felder v. State, 848 S.W.2d 85, 95 (Tex. Crim. App. 1992) (prosecutor
"may argue his opinions concerning issues in the case so long as the opinions are based on the
evidence in the record and not as constituting unsworn testimony"). We perceive no abuse of
discretion by the trial court in disallowing the argument. Defense counsel's objected-to argument
was not based on evidence offered and admitted at trial. Rather, it was based upon counsel's
personal interactions with the defendant and the conclusions defense counsel reached about appellant
as a result of that contact.

 Finally, appellant challenges the trial court's ruling regarding defense counsel's argument
that, "The death penalty should be the last drastic step, that you have to take somebody's life. There
should be nothing more that you could possibly do with somebody. You have to give him the death
penalty because there is nothing else we can do with this guy." The state objected that counsel's
argument misstated the law. The trial court sustained the objection. Contrary to appellant's
assertion, counsel's statement did not accurately summarize the death-selection process under Texas
law. See Art. 37.071, § 2(b) & (e). The trial court did not abuse its discretion by sustaining the
state's objection. Point of error fourteen is overruled.

Constitutionality of Article 37.071, Section 2(f)(4)

 In point of error fifteen, appellant argues that Article 37.071, section 2(f)(4), limits the jury's
consideration of all mitigating evidence, in violation of the Eighth and Fourteenth Amendments to
the United States Constitution and Sections 13 and 19 of Article I of the Texas Constitution. In point
of error sixteen, appellant contends that Section 2(f)(4) is unconstitutional under these same federal
and state constitutional provisions because it requires the jury to find a nexus between the
commission of the crime and any mitigating evidence. Appellant acknowledges that we have
previously rejected such facial challenges to Section 2(f)(4), (25) but invites us to revisit our precedent. 
We decline to do so. Points of error fifteen and sixteen are overruled.

 In point of error seventeen, appellant alleges that Section 2(f)(4) is unconstitutional as applied
to him because of the constitutional infirmities alleged in points of error fifteen and sixteen. 
Appellant contends that the jury charge and the state's closing argument exacerbated these alleged
constitutional deficiencies because they required the jury to restrict its consideration of any
mitigating evidence to that which reduced his moral blameworthiness for committing the capital
murder. 

 Appellant's argument has no merit. The record shows that the trial court's jury charge
included the definition of mitigating evidence required by Section 2(f)(4). As discussed above, we
have previously rejected appellant's constitutional challenges to Section 2(f)(4). Coble, 330 S.W.3d
at 296; Roberts, 220 S.W.3d at 534; Perry, 158 S.W.3d at 449. There was thus no constitutional
infirmity for the state's argument to aggravate. Further, we have reviewed the portion of the state's
closing argument of which appellant complains. We reject appellant's contention that the state
attempted to limit the kind of evidence to which the jury could give mitigating effect. Rather, we
think the state's argument was reasonably understood by the jury as an assertion that, whatever
mitigating effect the jury chose to give to the evidence before it, the mitigating effect was simply not
enough to warrant a sentence of life without parole. Point of error seventeen is overruled.

 We affirm the judgment of the trial court.


Delivered: June 18, 2014

Do Not Publish
1. Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.
2. Swain v. State, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005); King v. State, 953 S.W.2d 266, 271 (Tex.
Crim. App. 1997). 
3. Smith v. State, 74 S.W.3d 868, 872 (Tex. Crim. App. 2002); Rachal v. State, 917 S.W.2d 799, 806 (Tex.
Crim. App. 1996). 
4. At trial, appellant argued that alcohol use played a central role in the offense, as well as in his past
negative behavior.
5. The record shows that appellant was born in Ecuador. When he was roughly ten years old, Hazel and Jim
Cole adopted him and brought him to the United States.
6. Although investigators recovered a total of seven spent shell casings from the crime scene, they did not
recover any from the back bedroom where appellant shot Desirae.
7. The autopsies revealed that appellant shot Melissa and Desirae eleven times, expending the entire clip
plus a chambered round.
8. Thomas Tolson was the first patrol officer to arrive at the scene. Tolson testified that Rives, who was
pregnant, was upset and crying, holding her side, and had visible scratches on her arm; Freeman was also upset and
agitated. Tolson further testified that a spent shotgun shell for a 12-gauge shotgun was recovered from the scene. 
He stated that the shell would have had to have been actively "racked" in the shotgun before being fired, implying
that the shotgun did not discharge accidentally.
9. Trooper Mena testified that, after he apprehended appellant, another deputy assisted him with
handcuffing appellant and placing him in the backseat of a squad car. Appellant was then transported to the Wharton
County Jail. Trooper Mena stated that neither he nor the assisting deputy gave appellant warnings pursuant to
Article 38.22 or Miranda, but he also asserted that neither he nor his fellow deputy asked appellant any questions
other than appellant's name.
10. The videotaped statement reflected in State's Exhibit 8 has a total running time of twenty-eight minutes
and ten seconds. Appellant's statement, "I don't want to talk any more," occurs at roughly the eleven-minute, thirty-five-second mark. 
11. On appeal, appellant asked us to abate this matter, stating that the trial court had not entered written
findings of fact and conclusions of law concerning the voluntariness of his statements. We concluded that
supplementation of the record, rather than abatement of the appeal, was appropriate. See Tex. R. App. P. 34.5(c)(2). 
Accordingly, we directed the trial court to prepare and file its findings of fact and conclusions of law regarding this
issue and instructed the trial court clerk to forward the supplemented record.

 Although the findings refer to Officer Avila as "Sgt.," he identified himself at the beginning of his testimony
as "Senior Police Officer Xavier Avila." We will therefore refer to him as Officer Avila. 
12. State's Exhibit 1 is a document entitled, "Wharton County Sheriff's Department Magistrate's Warning
Certificate[,] Article 15.17 Texas Code of Criminal Procedure."
13. State's Exhibit 8 is the first videotaped statement.
14. In the record before us, appellant's statement to Officer Avila in Harris County (State's Exhibit 9) is
divided into three consecutive parts. Part one has a running time of twelve minutes and twelve seconds. Appellant's
invocation of his right to counsel occurs at approximately the four-minute, twenty-nine-second mark, during part one.
15. The trial court concluded that appellant invoked his right to silence in Wharton County when he stated,
"It's not going to happen tonight." However, we note the existence of cases which call into question whether that
particular statement constituted a clear and unambiguous invocation of appellant's right to silence. See Dowthitt v.
State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) (rejecting the appellant's argument that his statement--"I can't
say more than that. I need to rest"--was an unambiguous invocation of his right to remain silent); cf. Marshall v.
State, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006) (concluding that, when the appellant re-initiated contact with the
police to tell his side of the story, the trial court could reasonably have found that any invocation by the appellant of
his right to remain silent was ambiguous, thereby permitting the officer either to continue questioning or stop the
questioning to clarify whether the appellant really wanted to remain silent). The Court takes no position on whether
appellant's statement was a sufficient invocation of his right to silence.
16. As we recognized in Pecina, the "rights created in Miranda, including the right to have counsel present
during custodial interrogation, 'are not themselves rights protected by the Constitution but [are] instead measures to
insure that the right against compulsory self-incrimination [is] protected.'" 361 S.W.3d at 74 n.16; see also
Contreras v. State, 312 S.W.3d 566, 582 (Tex. Crim. App. 2010) ("Miranda does not set forth substantive
constitutional rights with regards to interrogations; rather, that decision and its progeny set up rules for the admission
of certain statements by the accused--excluding a statement under certain conditions when it is determined that law
enforcement failed to observe certain practices during a custodial interrogation."). 
17. These are the types of activities that the Supreme Court has excluded from the self-incrimination
privilege that the Fifth Amendment protects. See Jones v. State, 795 S.W.2d 171, 175 (Tex. Crim. App. 1990)
(noting the various police practices that the Supreme Court has excluded from the scope of the self-incrimination
privilege because they seek only physical evidence, not testimonial confessions of guilt).
18. The portion of the videotaped statement in which appellant expressed concern about his son testifying
fell within the segment of State's Exhibit 8 that was excluded from evidence, pursuant to appellant's motion to
suppress. 
19. We recognize that "safe" and "secure" are, sometimes but not always, synonyms. "Safe, secure may
both imply that something can be regarded as free from danger. These words are frequently interchangeable. Safe,
however, is applied rather to a person or thing that is out of or has passed beyond the reach of danger. The ship is
safe in port. Secure is applied to that about which there is no need to fear or worry: to feel secure about the future; .
. .." Webster's Encyclopedic Unabridged Dictionary of the English Language 1259-60 (1989). 

 In the prison context, "safe" may mean that inmates are free from danger, while "secure" can mean that
inmates are free from danger or that the physical boundaries of the prison cannot be breached by escape. It appears
from the record that the state used "safe" as a synonym for "secure."

20. Aubuchon agreed that "serious" staff and offender assaults were those that required more than first aid
and did not reflect the minor assaults that occurred within the TDCJ system.
21. Aubuchon defined "chunking" as the act of an offender mixing a variety of fluids and solids (generally,
urine and feces) and sometimes other material and throwing the mass into the hands or face of a correctional officer.
22. See Plummer v. State, 410 S.W.3d 855, 861 n.42 (Tex. Crim. App. 2013) (defining "3g" offenses as
those set forth in Article 41.12, section 3(g)(a)(1), and noting that "[a]lmost all of these listed offenses are violent
acts involving physical threat or harm."). 
23. The record shows that appellant bought the pistol linked to the shootings, which was entered into
evidence, at Bass Pro Shop. Based on that and the prosecutor's subsequent reference to "this gun," we presume that
the prosecutor was indicating that pistol during this portion of her argument.
24. Further, we note that appellant does not direct us to any testimony in the record regarding appellant's
intention to be a good father to his sons in the future, nor does our review reveal any.
25. See Coble v. State, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); Roberts v. State, 220 S.W.3d 521, 534
(Tex. Crim. App. 2007); Perry v. State, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004).